Revised July 26, 1999

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 97-20862

CHERYL STEADMAN; ET AL.,

Plaintiffs,

LISA SHEPPARD,

Plaintiff-Appellee,

versus

THE TEXAS RANGERS; ET AL.,

Defendants,

MAURICE COOK, Captain, Chief of the Texas Rangers,

Defendant-Appellant.

Appeals from the United States District Court
for the Southern District of Texas

July 6, 1999

Before POLITZ, EMILIO M. GARZA and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

This case presents us with an intriguing question at the intersection of semantics and constitutional law. We must determine whether the First Amendment rights of a female applicant to the Texas Rangers ("Rangers") were violated by Maurice Cook, the Chief of the Rangers ("Cook"), and, if so, whether Cook is entitled to qualified immunity. The twist to this case is that the applicant, Lisa Sheppard ("Sheppard"), while seeking to shoehorn supposed feminist beliefs into the constitutionally-protected rubric of political speech, concedes that she never verbally expressed these beliefs to Cook. Cook would have us hold, therefore, that he violated no First Amendment rights and

that, even if he did, his actions should be shielded by the doctrine of qualified immunity. The district court found genuine issues of material fact to exist and allowed the case to proceed past summary judgment. The court also found that Cook's violation of Sheppard's constitutional rights was not entitled to the protection of qualified immunity. After the most searching review, however, we disagree with the district court that Sheppard's views constitute something more than tacit, private beliefs. Ironically, even though Cook considered those beliefs when he worked to ensure that Sheppard would not be hired, we need not reach the question whether he is entitled to qualified immunity because we hold that he did not violate any of Sheppard's established rights. We therefore reverse the judgment of the district court and render judgment for Cook.

## BACKGROUND

I.    *Facts*

The Texas Rangers were organized and legally recognized in 1835. During the first one hundred years of their existence, they were eulogized as the white knights of the American Southwest.[1] In 1935, Texas created the Department of Public Safety ("TDPS"), which combined the Texas Rangers with the Highway Patrol. The TDPS is in turn under the guidance of the Public Safety Commission ("PSC"), whose three members are appointed by the Governor of Texas; the PSC's duties include the formulation of plans and policies for the TDPS and the supervision of the TDPS.

As of 1993, the Texas Rangers had never selected a woman for membership. Following increased pressure from both inside the Texas government and without, the PSC decided to hire

---

[1] At least one historian of the Rangers characterized them as "mounted soldier[s] . . . with no counterpart[s] in any age or country . . . Chivalrous, bold and impetuous in action, [they are] yet wary and calculating, always impatient of restraint, and sometimes unscrupulous and unmerciful." WALTER PRESCOTT WEBB, THE TEXAS RANGER 1 (1935).

2

female Rangers for the first time, a move which generated no small amount of controversy among the Rangers.

Sheppard joined the TDPS as a commissioned officer in 1983 and made known her desire to become a Ranger someday. According to TDPS policy, an applicant to the Rangers must have served eight years in the TDPS (or its equivalent). At the end of that probationary period, the applicant must take a written exam. If the applicant's score on the written exam is high enough, he or she will be presented to an oral review board. Each member of the review committee scores the applicant on a scale of 0-500, with the top overall scorers becoming Texas Rangers.[2]

By 1992, Sheppard had served her probationary period, and she took the written exam for the Rangers; her score was high enough to allow her to proceed to the oral interview.[3] Sheppard elected not to proceed through the interview process in 1992, however, after advice from several Rangers that it was not yet time for a woman to join the Rangers. Instead, Sheppard accepted a promotion to the rank of Criminal Investigator, believing that a year's experience in that position would help her when she re-applied for the Rangers the following year. No woman was made a Ranger in 1992.

In 1993, Sheppard again took the Rangers' written exam. This time, her score was among the highest of the individuals taking the exam, and she again qualified for review by the committee. After this second test, a number of individuals, including Ranger Lieutenant Ray Cano ("Cano") told

---

[2] This policy also required the highest and lowest score to be dropped, and the remaining scores to be averaged.

[3] Sheppard took the Criminal Intelligence Service written exam simultaneously and proceeded to that oral review board as well; she was selected by that committee to assume the position of Criminal Investigator.

3

Sheppard that she was not only the most qualified female applicant, but one of the most qualified of all applicants for a Ranger position in 1993. In addition, the Ranger assigned to investigate Sheppard's background found her qualified to become a Ranger.

In June 1993, Sheppard appeared before the oral interview board.[4] Cook, the Senior Ranger Captain, chaired the six-member interview committee. The day before Sheppard's interview, another woman, Cheryl Steadman ("Steadman") appeared before the board; following Steadman's interview, and in direct contravention of Rangers' policy, Cook insisted on reviewing the scores that Steadman had received from Cano and another committee member, Ranger Lieutenant Earl Pearson. He made numerous remarks, both disparaging and laudatory, about the various candidates, and he eventually told Cano and Pearson to change their scores because he wanted Steadman and another woman, Marrie Garcia, to be selected as Rangers.[5] Cano protested Cook's action to the extent that he suggested that Sheppard would make the best candidate of the women being discussed. Cook responded to Cano by saying that "we're not going to promote Lisa . . . [because] Lisa's too independent and she's too opinionated." As a result of Cook's pressure, both Cano and Pearson, knowing that they were violating procedure, changed the scores for Steadman so that she would be selected instead of Sheppard.

At Sheppard's interview the next day, some members of the committee, including Pearson, treated her with veiled contempt. Nonetheless, Sheppard was surprised to learn later that she had been an unsuccessful candidate for transfer to the Rangers; Steadman and Garcia were selected. She

_____

[4] The internal rules for reviewing candidates required committee members not to discuss the candidates after each had appeared before the board. In addition, no committee member was to review how any other committee member had scored the candidates.

[5] Cook also informed the other officers that he only wanted to promote two women.

4

later discovered that Cano had given her the highest score of any member of the committee (465 out of a possible 500 points); another member gave her the lowest score (250), while Cook gave her the second-lowest score (275). Because Sheppard's average interview score was lower than that of nine other applicants, she was not offered a position with the Rangers. Colonel James Wilson, the head of the TDPS, ratified the decisions made by Cook and the committee without having any direct knowledge of why Sheppard was not selected.

Sheppard contends that her low average score was due to retaliation by Cook motivated by his hostility toward her for her protected free speech activities, including her political beliefs, expressions, and associations. In support of this allegation, Sheppard adverts to another remark by Cook, not made during the selection process, that Sheppard was black-balled because she was a "woman's libber." Bruce Casteel, the Senior Ranger Captain who replaced Cook, and Ron Stewart, another Ranger officer, both testified in deposition that Cook made this remark.[6]

Sheppard has never denied that she believes in the equality of women, and the fact that she was one of the first women to apply to the Texas Rangers suggests that she does believe that women can and should serve in historically-male positions. The record below does not show, however, that Sheppard ever engaged in any free speech activity of either a public or a private nature or that any committee member relied upon or even heard Cook's "woman's libber" comment and impermissibly considered that comment to Sheppard's detriment.

II. *Course of Proceedings and Disposition Below*

---

[6] Cook's protocol violation did not become known until the pre-trial discovery in this case, nearly four years after Sheppard was rejected. Mary Ann Courter ("Courter"), the Director of Personnel for the TDPS in 1993, stated in her deposition that, had she known of this violation at the time, the interview process would have been halted and the problem rectified before any individuals had been selected.

Sheppard brought this lawsuit against the Texas Department of Public Safety ("TDPS") and Cook claiming under 42 U.S.C. § 1983, *inter alia*, the violation of her First Amendment rights. Cook filed a motion to dismiss and a motion for summary judgment on the basis of qualified immunity. The district court denied both of Cook's motions, determining that Sheppard produced sufficient evidence to establish a genuine issue of material fact concerning her First Amendment claim. Cook now appeals the lower court's denial of his motion to dismiss and for summary judgment.

## DISCUSSION

I.    *The Exercise of Appellate Jurisdiction*

Before reaching the merits of this case, we must first satisfy ourselves that the appeal is properly before us. Sheppard would have us avoid a discussion of the merits of Cook's appeal by finding that the appeal concerns the sufficiency of the evidence surrounding Sheppard's claim rather than the determination of an issue of law. We are unpersuaded by this argument and thus conclude that we possess jurisdiction to accept this appeal.

The denial of Cook's motions to dismiss and for summary judgment, and the district court's refusal to accept his defense of qualified immunity, were based on judgments of law. Appellate jurisdiction is proper under the collateral order doctrine where the district court's ruling was based on an issue of law. See 28 U.S.C. § 1291; Mitchell v. Forsyth, 472 U.S. 511, 524-25 (1985). An order is purely legal where it concerns only the application of established legal principles to a given set of facts. See Johnson v. Jones, 515 U.S. 304, 313-14 (1995). An order is not "legal" where it resolves a fact-related dispute of "evidence sufficiency." Id. Here, the legal principle is the objective reasonableness of an official's conduct under clearly-established law, the qualified immunity doctrine.

In an earlier case involving the same issue—appeal of a denial of qualified immunity—we held that the collateral order doctrine permits an interlocutory appeal in circumstances such as these, even though we normally would not hear an appeal from a denial of summary judgment. See Wren v. Towe, 130 F.3d 1154, 1157 (5th Cir. 1997). Even the existence of disputed issues of material fact does not preclude review where the district court's actions were based in law. See Hare v. City of Corinth, 135 F.3d 320, 324 (5th Cir. 1998); Wren, 130 F.3d at 1157. Indeed, "Johnson permits petitioner to claim on appeal that all of the conduct which the District Court deemed sufficiently supported for the purposes of summary judgment met the Harlow [v. Fitzgerald, 457 U.S. 800 (1982)] standard of objective legal reasonableness." Wren, 130 F.3d at 1157 (quoting Behrens v. Pelletier, 516 U.S. 299, 313 (1996)) (internal quotation omitted); see also Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 531 (5th Cir. 1997).

We are satisfied that the district court's action in this case was based in law; taking this appeal comports with our prior rulings in this area and with the accepted understanding of the collateral order doctrine, and we thus recognize our jurisdiction.

II.    *The District Court's Order*

On September 22, 1997, the district court entered an order denying Cook's motions for summary judgment and to dismiss. It is not clear from the face of the order whether the district judge based his decision on Rule 12(b)(6) or Rule 56, and, because the basis of his decision is of some import in determining this appeal, we thus pause to consider the question.

Pursuant to our review of the record in this case, we are persuaded that the district court issued its order on the basis of Rule 56. To reach this conclusion, unfortunately, we had "to undertake a cumbersome review of the record to determine what facts the district court . . . likely

7

assumed," Johnson, 515 U.S. at 319, because the district court did not explicitly name the type of order issued. The district court used terminology normally associated with summary judgment motions and motions to dismiss interchangeably throughout the opinion—at one point observing that Defendant was "essentially argu[ing] that Plaintiff Lisa Shepard's first amendment cause of action should be dismissed against the defendants based upon Eleventh Amendment immunity . . . and qualified immunity," Order of September 22, 1997, at 1-2, but then later referring to the sufficiency of Plaintiff's "summary judgment evidence" in determining whether the claims should be "dismissed." Id. at 3.

After carefully reviewing the record, we are persuaded that, in denying the motions, the district court considered information beyond the pleadings, commenting as he did that Plaintiff's "summary judgment evidence" was "sufficient . . . to establish a genuine issue of fact concerning her first amendment claim against Cook." Id. We thus consider this appeal as protesting the denial of summary judgment.

III.    *Standard of Review*

We exercise de novo review of the grant of a summary judgment.[7] See Wenner v. Texas Lottery Comm'n, 123 F.3d 321, 324 (5th Cir. 1997). Summary judgment shall be entered in favor of the moving party if the record, taken as a whole, "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is "genuine" where a reasonable jury could return a verdict for the nonmoving party. See Crowe v. Henry, 115 F.3d 294, 296 (5th Cir. 1997). If the record, taken as

_____

[7] While we normally do not review the denial of summary judgment on interlocutory appeal, the collateral order doctrine supports review in this case. See supra, part I.

8

a whole, could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 547, 597 (1986).

IV.    *The First Amendment Claims*[8]

To establish a § 1983 claim of retaliation for the exercise of free speech activities, a plaintiff must prove that (1) the defendant was acting under color of state law; (2) the plaintiff's speech activities were protected under the First Amendment; and (3) the plaintiff's exercise of her protected right was a substantial or motivating factor in the defendant's actions. See Pierce v. Texas Dep't of Crim. Justice Inst. Div., 37 F.3d 1146, 1149 (5th Cir. 1994). Another aspect of the test, which should go without saying but which is central to the case at bar, is that the plaintiff actually *spoke* or otherwise engaged in speech activities recognized by our First Amendment jurisprudence.

Cook argues that because Sheppard did not "speak out" on issues of public concern, she has no First Amendment claim. He reasons that, even if he thought Sheppard were a "woman's libber," he maintained this belief not because of anything Sheppard ever said, or because of any groups to which she belonged, but because of her comportment or for other non-speech reasons. As such, he contends, his decision to undermine her candidacy did not violate any of Sheppard's First Amendment rights, and he should be entitled to qualified immunity.[9]

---

[8] It is worth pause to remember that Sheppard's claim on appeal is hers only and is for First Amendment violations. She does not allege gender discrimination.

[9] As we note below, we need not reach the qualified immunity question presented by Cook to decide this case. For the sake of completeness, we simply note that, "[a] court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." Wilson v. Layne, — U.S. —, — S. Ct. —, 1999 WL 320817, *4 (1999).

Although Cook's contention that Sheppard never verbally espoused feminist ideals or advertised her membership in feminist political organizations is seductive, we do not dismiss out of hand Sheppard's claim that she was subjected to retaliation for First Amendment activities. "Speech," as we have come to understand that word when used in our First Amendment jurisprudence, extends to many activities that are by their very nature non-verbal: an artist's canvas, a musician's instrumental composition, and a protester's silent picket of an offending entity are all examples of protected, non-verbal "speech." See, e.g., National Endowment for the Arts v. Finley, 524 U.S. 569, —, 118 S. Ct. 2168, 2175 (1998) (accepting as a first principle that "artistic speech" qualifies for First Amendment protection); R.A.V. v. City of St. Paul, 505 U.S. 377, 391 (1992) (finding constitutional non-verbal "[d]isplays containing abusive invective"); see also Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 790 (1994) (Scalia, J., concurring in part and dissenting in part) (listing as forms of persuasive speech "singing, chanting, praying, shouting, the playing of music . . . from handheld boom boxes, speeches, peaceful picketing, communication of familiar political messages, [and] handbilling"). Requiring Sheppard verbally to espouse her political views in the workplace in order to receive the protection of the First Amendment would constrain us in a way that we deem undesirable.

Indeed, the Supreme Court has never required that an individual "speak out" in order to find shelter under the First Amendment. Where lower-level government employees have been punished because of their political beliefs and associations, the Court has held that their First Amendment rights were violated. See Rutan v. Republican Party of Illinois, 497 U.S. 62 (1989); Branti v. Finkel, 445 U.S. 507 (1980); Elrod v. Burns, 427 U.S. 347 (1976). In each of those cases, the plaintiffs suffered adverse consequences not because of anything they said, but because they were not members of a

10

particular political party or organization. The Court found that "there is no requirement that dismissed employees prove that they, or other employees, have been coerced into changing, either actually or ostensibly, their political allegiance;" they must merely show that they were "discharged because they were not affiliated with or sponsored by" a particular party. Branti, 445 U.S. at 517. Following the same logic, if an employee is discharged *because* of her affiliation with a party, she also would be protected.[10] In either case, the affected individual "will feel a significant obligation to support political positions held by [her] superiors, and to refrain from acting on the political views [she] actually held, in order to progress up the career ladder." Rutan, 497 U.S. at 76.

Where a government employee has engaged in speech—either verbally or through such an association—we apply the balancing test that we enunciated in Click v. Copeland, 970 F.2d 106 (5th Cir. 1992). In Click, we concluded that a court must balance an employee's First Amendment rights with the employer's right to loyal and efficient service. Where no "countervailing considerations appear[] against the employees' right to believe as they chose," id. at 112, the employee's First Amendment rights should be given full weight.

Cook argues that, if we deem Sheppard's belief to constitute speech, she would nonetheless not merit protection because advocating gender equality is not a matter of public concern. Cf. Click, 970 F.2d at 112 (listing as a component of the balance whether the employee's speech involved a matter of public concern). While one could debate whether an individual's belief in the equality of women and men is a matter of public concern, we are not called upon to decide this question because of the lack of record evidence that Sheppard expressed her views on this issue one way or the other.

___

[10] Employees who are denied promotions, transferred, or not rehired after layoffs because of their political affiliations are also protected under this line of cases. See Rutan, 497 U.S. at 72.

11

Even assuming that the residue of the Click balancing test favored a finding that Sheppard engaged in speech activities, it is an understatement to say that her claim does not fall within an easily-cognizable free-speech paradigm. By never saying *anything*, Sheppard may only rely on the Supreme Court's political association jurisprudence to anchor her First Amendment claim. Unfortunately for her case, this foothold is decidedly narrow because Sheppard never produced *any* evidence showing an outward sign of her membership in a feminist organization or support—even tacit support—of a feminist agenda.[11] Notwithstanding the fact that Cook *thought* she was a member of a political organization that he disdained and that Sheppard never denied these political beliefs, we cannot simply allow the case to proceed past summary judgment on the theory that Cook's actions on their face were an attempt to violate Sheppard's First Amendment rights. Cook's bad motive alone is insufficient under our case law to establish a First Amendment claim. See Jones v. Collins, 132 F.3d 1048, 1052-55 (5th Cir. 1998).

---

[11] This case leaves us with a sense of great consternation, largely because our repeated search of the record failed to disclose anything but a murky link between Sheppard and feminist causes or organizations. What Sheppard lacked was an indicia of *support* for feminism beyond simply wanting to be a Texas Ranger. Had she demonstrated that support in *any* outward way, we might have found, as a sister circuit did in a similar case, that a supportive association which is nonetheless completely silent is entitled to First Amendment protection. See Hatcher v. Board of Public Education, 809 F.2d 1546, 1557 (11th Cir. 1987).

In Hatcher, the Eleventh Circuit addressed the complaint of an elementary school principal who was demoted by her school board. The principal discreetly attended protests of the board's decision to close her school and appeared in public with the families of some of the protest leaders but never expressed verbal animosity for the school board or support for the parents. See id. In that case, silent presence qualified as speech because it was interpreted in the community as support for the protest. More importantly, the principal's association served as the catalyst for the school board's decision to retaliate against her. Sheppard cannot point to a single event or association which might have led Cook or other members of the Rangers to associate her with feminist organizations, and it is on that ground that her claim ultimately founders.

Based on our independent review, then, we are inclined to a different outcome than our learned colleague below. We sympathize with the district court's struggle through the maze of this close case and its search for a clarion dispute over material facts, but we ultimately believe that the case cannot proceed because Sheppard never placed into evidence *any* set of facts that would allow a reasonable jury to conclude that Cook violated her First Amendment rights. Instead, she has attempted to weave a garment of whole cloth from disparate strands, but she has succeeded in fashioning only a piecemeal claim.

Sheppard's argument to this court had threshold appeal because the evidence is *overwhelming* that Cook acted unreasonably in deliberately rigging the selection process. Cook even willingly admits that he made the offensive statements at issue.[12] Although we readily note our disdain for Cook's improper actions, we nevertheless conclude that Sheppard presented inadequate proof for her claim that she engaged in speech or other activities entitled to protection under the First Amendment. Consequently, her case cannot proceed under our established First Amendment jurisprudence, and we need not reach the qualified immunity question presented had we found otherwise.

## CONCLUSION

For the foregoing reasons, we conclude that Sheppard has not presented enough evidence to survive summary judgment, and that Cook's motion was therefore improvidently denied by the

---

[12] Justice Holmes once observed that "[a] word is not a crystal, transparent and unchanged, [but] it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." Towne v. Eisner, 245 U.S. 418, 425 (1918). Cook's referring to Sheppard as "independent," "opinionated," and a "woman's libber" signified insulting remarks lobbed in the direction of a woman who was seeking to change 150 years of chauvinism. From another's lips, the phrase might have been a compliment instead of solecism, referring instead to her steadfastness and stony courage in the face of obstacles.

district court.  We therefore REVERSE the judgment of the district court and RENDER judgment for Cook.

REVERSED AND RENDERED.

EMILIO M. GARZA, Circuit Judge, specially concurring:

I concur, but write separately to elaborate on the majority's statement that "[e]ven the existence of disputed issues of material fact does not preclude review where the district court's actions were based in law."[13] The statement simply stands for the proposition that we can consider an unsuccessful summary judgment motion that asserts qualified immunity when the defendant takes the genuine issues of material fact off the table) ) by accepting the plaintiff's version of the facts) ) and thereby leaves us with nothing to review but legal issues. *See Behrens v. Pelletier*, 516 U.S. 299, 313, 116 S. Ct. 834, 842, 133 L. Ed. 2d 773, ___ (1996) ("*Johnson [v. Jones*, 515 U.S. 304, 319, 115 S. Ct. 2151, 2159, 132 L. Ed. 2d 238, ___ (1995),] permits [the defendant] . . . to "claim on appeal that all of the conduct which the District Court deemed sufficiently supported for purposes of summary judgment met the *Harlow* standard of objective reasonableness"); *see also Colston v. Barnhart*, 146 F.3d 282, 284 (5th Cir.) (discussing *Behrens*) (explaining the difference between "genuineness" and "materiality" in the context of qualified immunity), *cert. denied*, ___ U.S. ___, 119 S. Ct. 618, 142 L. Ed. 2d 557 (1998); *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 536 (5th

---

[13] The majority's statement re-affirms what some of our earlier panels have said. *See Hare v. City of Corinth, Miss.,* 135 F.3d 320, 324 (5th Cir. 1998) ("The denial of summary judgment on qualified immunity is, of course, immediately appealable, even when a genuine issue of material fact exists, when the order determines a question of law."); *Wren v. Towe*, 130 F.3d 1154, 1157 (5th Cir. 1997) ("A district court's denial of summary judgment is not immune from interlocutory appeal simply because the denial rested on the fact that a dispute over material fact issues exists."), *cert. denied*, ___ U.S. ___, 119 S. Ct. 51, 142 L. Ed. 2d 40 (1998); *Naylor v. State of La., Department of Corrections*, 123 F.3d 855, 857 (5th Cir. 1997) ("to the extent that a district court order denying qualified immunity determines an issue of law, such an order is appealable in spite of the existence of genuine issues of material fact"); *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 531 (5th Cir. 1997) ("Insofar as the district court order determines a question of law, . . . the denial of qualified immunity is appealable, notwithstanding the existence of a genuine issue of material fact.").

Cir. 1997) (Emilio M. Garza, J., specially concurring) (approving of the grant of summary judgment based on qualified immunity because the factual dispute concerned an immaterial issue).

Accordingly, I concur.