Susana GOMEZ, Plaintiff,

v.

CITY OF EAGLE PASS, Defendant.

No. DR–95–CA–85.

United States District Court,
W.D. Texas,
Del Rio Division.

March 20, 2000.

<hr/>

Tracey Whitely, Edinburg, TX, Jose Garza, Edinburg, TX, for Susana Gomez, plaintiff.

Albert Lopez, Law Offices of Albert Lopez, San Antonio, TX, for City of Eagle Pass, The City of Eagle Pass, Texas, Raul Trevino, Mayor, Jose. Mora, City Council Member, City of Eagle Pass, defendants.

## MEMORANDUM OPINION

JUSTICE, Senior District Judge.

At the trial of this civil action, the defendant, City of Eagle Pass, moved at the close of plaintiff's case in chief for judgment as a matter of law pursuant to Fed. R.Civ.P. 50(a). A ruling on the motion was deferred, and the defendant renewed the motion after the close of all evidence. For the reasons set forth below, the defendant's motion will be denied and judgment for the plaintiff will be issued in accordance with the jury's verdict in this case.

### Background

Plaintiff, Susana Gomez, filed this action on November 29, 1995, alleging that she had been illegally discharged from her employment by defendant because of her political affiliation and her gender. Gomez was initially hired as city manager for the City of Eagle Pass in November of 1993, at an annual salary of $50,000. At the time she was hired, a political majority favorable to the plaintiff had recently been elected to the city council. This majority consisted of David Riojas, Romelia Cardo-

na, and Oscar Rodriguez. But, Cardona was defeated at the next election by Jose Mora in May of 1994. Also in the 1994 elections, Riojas ran for mayor and was defeated by Raul Trevino, a political ally of Mora. Franscisco "Paco" Farias, plaintiff's predecessor as city manager, was elected to the city council at the time Cardona lost her seat and Riojas lost his mayoral election. Thus, as a result of the 1994 city elections, a new political majority was elected to govern the City of Eagle Pass. The first official action of the new majority of the city council was to dismiss plaintiff and to hire John Ruiz, Jr., a city employee and godfather to one of Trevino's children, as city manager. Plaintiff then filed the instant action, alleging discrimination on the basis of political affiliation and sex.

## Sex Discrimination Claim

The defendant, City of Eagle Pass, presents three arguments in support of its motion for judgment as a matter of law on plaintiff's claim of sex discrimination. First, defendant maintains that plaintiff was a "policy-making" employee and is consequently excepted from the statutory definitions of *employee* under Title VII and the Texas Commission on Human Rights Act (TCHRA). Second, defendant argues that plaintiff was a member of the city council's "personal staff" and, consequently, is excepted from the Title VII and TCHRA definitions of employee. Third, defendant asserts that the plaintiff's evidence is insufficient for the jury to have concluded that the plaintiff's termination from her employment was motivated by gender.

As a preliminary matter, it is noted that the first two of these three arguments concerning the policy-making and personal staff exceptions to the Title VII definition of employee were presented to the Honorable Fred Biery, United States District Judge, who presided over this action prior to its transfer. Judge Biery rejected these arguments, and denied defendant's motion for summary judgment without elaboration. The defendant's burden on motion for summary judgment was, of course, greater than its present burden in arguing for judgment as a matter of law on an issue which did not go to the jury. However, evidence produced at trial strongly buttresses the conclusion that defendant may not avail itself of either exception to the definitions of employee. After an independent review of the evidence, it is found that the plaintiff falls squarely within the definitions of employee under both Title VII and TCHRA.

### The Definition of Employee Under TCHRA

Plaintiff brought this action under the Texas Labor Code and amendments to Tex.Rev.Civ. Stat. Ann., art. 5221k, alleging that she was discriminatorily terminated from the position of city manager of Eagle Pass, Texas, because of her sex. Defendant asserts that plaintiff is not an employee within the definition of the Texas Labor Code because it exempts both policymakers and members of an elected office-holder's personal staff. Plaintiff responds that both exceptions to the definition were repealed by an amendment to the code which became effective September 1, 1993. Defendant insists, however, that the deletion of the exceptions did not occur until 1995, *after* the plaintiff's termination. The report and recommendation of the U.S. Magistrate Judge concerning the applicability of these exceptions to the plaintiff resolved the confusion surrounding the date of the amendment in favor of the defendant. That recommendation was subsequently rejected without elaboration by Judge Biery, who denied defendant's motion for summary judgment on plaintiff's TCHRA claim.

■ A prior ruling in this case by another district court judge on an issue of law may not be set aside in the absence of changed circumstances. *See, e.g., Messenger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912). However, even upon independent consideration of the issue, it is concluded that the plain-

tiff's interpretation regarding the date of applicability of the amendment is correct. It is concluded, moreover, that the legal staff of the legislative council became aware that the text of the definition of employee in the labor code as enacted in 1993 did not accurately reflect the substance of the law, as altered by an amendment deleting the exceptions from the definition of employee, which was passed as House Bill 860 (Chapter 276, Actions of the 73rd Legislature, Regular Session, 1993). Accordingly, as part of its duty to revise statutes, the staff proposed to the legislature in 1995 a bill that became Senate Bill 959, which was simply a "code update bill," aimed at conforming the code to prior legislative changes. As such, the code update bill was intended to reflect current law and was not intended to change its substance. The substantive deletion of the exceptions having occurred in 1993, plaintiff's suit, based on her termination in 1994, is governed by the amended version of the law. Plaintiff, therefore, falls squarely within the amended statute's definition of employee, which did not contain the relevant exceptions at the time of her firing.

In addition, it is noted that even if the former exceptions to the definition of employee were applicable to this case, the plaintiff is neither a policymaker nor a member of an elected official's personal staff. As was noted by the Magistrate Judge in his report and recommendation to the district court on the defendant's motion for summary judgment, neither the Texas Labor Code nor Texas case law defines what constitutes a policymaking or personal staff position. However, Texas courts have often noted that the TCHRA has among its express purposes the implementation of the policies of Title VII of the 1964 Civil Rights Act, which targets discrimination in employment. *Austin State Hosp. v. Kitchen,* 903 S.W.2d 83, 87–88 (Tex.App.—Austin 1995, no writ) (citing the TCHRA). Because the TCHRA seeks to promote federal civil rights policy, and because Texas has little case law interpret-

ing it, analogous federal precedent will be examined. *Id. See also Holt v. Lone Star Gas Co.,* 921 S.W.2d 301, 304 (Tex.App.—Fort Worth 1996, no writ); *Farrington v. Sysco Food Servs., Inc.,* 865 S.W.2d 247, 251 (Tex.App.—Houston [1st. Dist.] 1993, writ denied) (opinion on rehearing).

### *The Definition of Employee Under Title VII*

Title VII specifically excludes from protection of the statute "[a]ny person elected to public office in any state or political subdivision of any state ... or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policymaking level...." 42 U.S.C. § 2000e(f). In *Calderon v. Martin County,* 639 F.2d 271 (5th Cir.1981), the Fifth Circuit held that a plaintiff's status as an employee for purposes of Title VII must be determined on a case-by-case basis through careful evaluation of the facts. In reversing the district court's holding that a deputy sheriff was excluded from the definition of employee, the *Calderon* court stated that the scope of the exceptions to the definition is to be ascertained through examination of the statutory language of Title VII, its legislative history, existing federal case law, and the particular circumstances of the case at hand. *Calderon,* 639 F.2d at 273.

### I. Policymaking Exception

The legislative history of the exceptions make clear that Congress intended that they be narrowly construed. Joint Explanatory Statement of Managers at the Conference on H.R. 1746, 92d Cong., 2d Sess., reprinted in 1972 U.S.Code Cong. & Ad.News 2137, 2179, 2180; *Calderon v. Martin County,* 639 F.2d 271 (5th Cir. 1981). In addition, as was noted by the Fifth Circuit in *Calderon,* "Congress amended Title VII specifically to bring governments and government agencies [and] political subdivisions under the Act's requirements." *Calderon,* 639 F.2d at 273 (citing Equal Employment Opportunity

Act of 1972, Public Law No. 92–261, 86 Statute 103 (codified at 42 U.S.C. § 2000e(a) (1976))).

■ Although there are no cases in the Fifth Circuit interpreting the Title VII exception for policymakers, the Eighth Circuit, in *Stillians v. Iowa,* 843 F.2d 276 (8th Cir.1988), articulated three factors relevant to the determination of whether an employee falls within the policymaking level exception: "(1) whether the employee has discretionary, rather than solely administrative powers ... (2) whether the employee serves at the pleasure of the appointing authority ... (3) whether the employee formulates policy...." *Stillians,* 843 F.2d at 278–79 (citations omitted).[1] It is undisputed that the city manager serves at the pleasure of the city council. However, it is clear from the language of the Eagle Pass City Charter, and from the witness' descriptions of the functioning of the city government of Eagle Pass, that the city manager has administrative, and not discretionary, powers. It is also obvious from those sources that the city manager does not "formulate policy." *See Brown v. Polk County, Iowa,* 811 F.Supp. 432 (S.D.Iowa 1992) (director of information systems department for county did not serve on policymaking level where director's responsibilities, although supervisory in nature, were administrative rather than discretionary, and any ultimate decision making on important, policy initiatives was left to county administrator and county board of supervisors).

The Eagle Pass City Charter unequivocally states that the city council holds the power to determine city policy, and that the city manager is responsible for the ministerial execution of the laws and the administration of the government of the city. Charter, City of Eagle Pass §§ 1 &

7. Section 1–1 of the Charter states, in pertinent part:

> Pursuant to its provisions and subject only to the limitations imposed by the state constitution, the statutes of this state, and by this charter, all powers of the city shall be vested in an elective council, hereinafter referred to as the city council, which shall enact local legislation, adopt budgets, determine policies and appoint the city manager, who in turn shall be held responsible to the city council for the execution of the laws and the administration of the government of the city.

Further, the Charter explicitly states that those administrative responsibilities charged to the city manager, including the duty to appoint and remove employees, are not plenary, but instead are controlled by federal and state statutes, local ordinances, and the provisions of the Charter itself:

> The city manager shall see that all laws, provisions of this charter, and ordinances passed by the council subject to enforcement by him or by officers subject to his direction and supervision under this charter, are faithfully executed, and that all contracts, permits, privileges and franchises to which the city is a party are properly performed.

Charter, § 7–1(c). Thus, the city manager's direct and specific charge is to carry out and administer the policies which are developed independently by the city council. The Charter makes plain that in those instances in which the functions of the city manager are not specifically prescribed by the Charter, his or her actions are to be determined by local ordinance, the state constitution, or state statutes. Furthermore, the explicit and uncontroverted testimony of David Riojas, Romelia Cardona, and Raul Trevino confirmed the role of the city council as the sole policymaking body for the city of Eagle Pass, and the role of

---

1. In *Stillians,* the court was deciding the exception under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–34, which contains the same definition of employee as is given in Title VII. Because the personal staff exception in the ADEA is identical to the personal staff exception found in Title VII, courts construe the two exceptions consistently. *See, e.g., Montgomery v. Brookshire,* 34 F.3d 291, 294 (5th Cir.1994).

the city manager as the chief administrative officer designated to implement that policy. It is found that these characterizations of the day-to-day work of the city manager are highly credible.

Defendant makes much of the fact that the city manager has the authority to appoint, suspend, or remove city employees. However, the plaintiff presented sufficient evidence demonstrating that even these decisions are so tightly circumscribed by local custom, city ordinances, state statutes, and the Eagle Pass City Charter, that they are properly characterized as administrative decisions made in the furtherance of the city manager's duty to supervise the administration of city government, and do not rise to the level of making policy—a task clearly retained by the city council itself.

Aside from its argument based on the city manager's authority to hire and fire, defendant's arguments that plaintiff is a policymaker are grounded almost exclusively in case law construing 42 U.S.C. § 1983, not on cases giving meaning to "policymaking" for purposes of Title VII or the history of that legislation. While the inquiry into governmental liability under § 1983 may involve some similar concerns as the questions surrounding the scope of protections afforded employees by Title VII, a court must be wary of importing a body of law which Congress did not clearly reference in its enactment and amendment of Title VII. As is noted above, the exceptions to the definition of employee were intended by Congress to be construed narrowly. The language in Title VII in part resembles that of another fed-eral statute, but this fact does not resolve the meaning of "policymaking" in the context of a narrow exception to an overall ban on discrimination in employment. Put simply, decisions about when governments should be held liable for the acts of governmental policymakers should not necessarily be held to determine the scope of a federal ban on employment discrimination. The defendant's invitation to reason by analogy to § 1983 without a directive from Congress to do so will thus be rejected.[2]

Based on the above discussion of the legislative history of Title VII, existing federal case law, and the facts of this case, it is, accordingly, concluded that plaintiff is not a policymaker for purposes of the exception to the definition of employee in Title VII.

## II. Personal Staff Exception

Defendant also urges that the court find plaintiff to be exempt from Title VII based on her status as a member of an elected official's "personal staff." Like the exception for policymakers, this exception was intended by Congress to be construed narrowly. As the Tenth Circuit has put it, "Congress intended for the personal staff exception to apply only to those individuals who are in highly intimate and sensitive positions of responsibility on the staff of the elected official." *Owens v. Rush*, 654 F.2d 1370, 1375 (10th Cir.1981).

Defendant concedes that the language of the personal staff exception appears to confine its scope to those relationships comprised of an individual serving a

---

**2.** Defendant also relies heavily on cases involving the lesser First Amendment protection afforded policymakers under the *Elrod–Branti* line of cases, introduced below at page 14. Some circuits have held that the test for exemption under the Title VII definition of employee and the test for excepting some policymakers from full First Amendment protection are identical. *See Americanos v. Carter*, 74 F.3d 138 (7th Cir.1996); *Schallop v. New York State Dept. of Law*, 20 F.Supp.2d 384 (N.D.N.Y.1998); *Lee v. Wojnaroski*, 751 F.Supp. 58, 63 (W.D.Pa.1990). In contrast, the Fifth Circuit has interpreted the *Branti* exception for policymaking employees to require close consideration of the context of the employment and the actual or potential disruption to the workplace relationship—factors arguably not relevant to the Title VII exception inquiry. Therefore, the application of one uniform test to both questions of law, without further instruction from the Fifth Circuit, will not be attempted.

single elected official.[3] Defendant, nonetheless, urges the court to apply the exception to the relationship between the collective members of the city council and the city manager. Defendant provides the court with no legal authority for the expansion of the exception, the text of which is unambiguous. Because the city manager is accountable not to an elected official, but to a collective decision-making body, it is found that she does not fit within the personal staff exception.

This reading of the clear statutory language is bolstered by common sense. The personal staff exception is grounded on Congress' perception that elected officials need complete loyalty from their closest staff members, untainted by the threat of litigation. It must be remembered that the exception was meant to target those close, "personal" relationships, and not merely all relationships between elected officials and their employees. This is reflected in the comments made by Senator Ervin, the sponsor of the original Senate amendment containing the exception, who said during the debate that the purpose of the amendment was "to exempt from coverage those who are chosen by the Governor, or by the Mayor, or the County Supervisor, whatever the elected official is, and who are in *close personal* relationship and in an *immediate relationship* with him." 118 Cong. Rec. 4492–93 (1972) (emphasis added).

Such close, intense, and demanding relationships built on loyalty between superior and inferior seem, intuitively, less likely to be found in a situation where a group of persons collectively exert control over a single person. In such circumstances, it is improbable that the personal intimacy and the immediacy of the relationship between the individual and the group, or even between the individual and certain members of the group, will be of the same intensity as the intimacy and immediacy between

two single persons. At the very least, it must be conceded that the two kinds of relationships are qualitatively different in some, if not many, respects. It can not, therefore, be assumed that Congress meant to preserve a set of relationships that it did not specifically mention, which fall outside the plain text of the exclusion, and which are necessarily different from the relationships targeted. Finally, regardless of the weight to be afforded the empirical observations here made, to strain the simple text of the exception where both legislative history and legal precedent clearly require a narrow reading would be specious and unwarranted.

■ Looking beyond the fact that plaintiff does not have a single elected official as her employer, it is by no means certain that plaintiff would qualify for the exception. It having been decided that plaintiff is outside the clear text of the exception, defendant's claim that she is a personal staff member will not be evaluated. However, it is observed, parenthetically, that there are difficulties in applying the exception to the plaintiff, even if, for the sake of argument, her multiple superiors did not foreclose its application. In *Teneyuca v. Bexar County,* 767 F.2d 148 (5th Cir.1985), the Fifth Circuit announced the factors to be considered in determining whether an employee comes within the Title VII personal staff exception. These factors include: (1) whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the elected official and

---

**3.** Under Title VII, the definition of employee does not include "[a]ny person elected to public office ... or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy-making level. ..." 42 U.S.C. § 2000e(f).

the person filling the position. 767 F.2d at 151. Even if judgement regarding factor two, the accountability to one official, is temporarily suspended, the preponderance of the evidence at trial does not demonstrate that the city manager represents the city council in the eyes of the public as required by factor three. *See, e.g., Clark v. Tarrant County,* 798 F.2d 736, 742 (5th Cir.1986) (probation officers do not represent judges to the general public in the same way that an assistant district attorney or an undersheriff represents the district attorney or sheriff); *cf. Owens v. Rush,* 654 F.2d 1370 (10th Cir.1981) (undersheriff is second in authority and acts on behalf of the sheriff when the sheriff is not available or present); *Ramirez v. San Mateo County,* 639 F.2d 509 (9th Cir.1981) (assistant district attorney represents the district attorney in legal proceedings and in the eyes of the public). Last, viewing plaintiff's and defendant's evidence together, it is questionable that the working relationship between the city council and manager involves the degree of intimacy and contact required by factor six. However, it having been found that the plaintiff falls outside the clear text of the exception, the comprehensive six-factor analysis employed in *Teneyuca* will not be pursued.

### Evidence of Discriminatory Intent

■ With regard to defendant's argument that plaintiff's evidence of discriminatory intent is insufficient to support the jury's verdict, the law requires that in evaluating a motion for judgment as a matter of law under Fed.R.Civ.P. 50(a), the court should view all evidence and make all reasonable inferences in favor of the non-movant. *Baltazor v. Holmes,* 162 F.3d 368, 373 (5th Cir.1998). If reasonable persons could differ in their interpretation of the evidence, the motion should be denied. *Id.* Only when the facts and the reasonable inferences are such that a reasonable juror could not reach a contrary verdict may the district court properly grant a motion for judgment as a matter of law. *Id.* To grant defendant's motion, it would be necessary to find that "the facts and inferences point so strongly and overwhelmingly in favor" of the defendant that reasonable people could not conclude otherwise. *Texas Farm Bureau v. United States,* 53 F.3d 120, 123 (5th Cir.1995). *See also Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969).

Plaintiff presented evidence of the paucity of women in the city's employment, especially in positions of authority, accompanied by evidence of the disparities in salaries between men and women hired by the city. The testimony of witnesses Riojas, Cardona, and Gomez detailed the disparate treatment of plaintiff as compared to prior and subsequent male city managers. Riojas and Cardona both testified as to the statements, including a derogatory reference to women, made by former mayor Garcia, who opposed plaintiff's hiring. In addition, plaintiff offered abundant evidence that the reasons offered for her dismissal were pretextual. Finally, defendant's challenge to plaintiff's expert, Dr. Robert Brischetto, is wholly without merit.

■ Plaintiff has fully met her burden through her presentation of lay witness and expert witness evidence of defendant's discriminatory motive. Viewing all of this evidence and the reasonable inferences therefrom in favor of the non-movant, the evidence clearly supports the jury's verdict for the plaintiff on the issue of gender bias.

### Political Patronage

Defendant also seeks judgment as a matter of law as to plaintiff's political patronage cause of action. Defendant argues first that political affiliation is an appropriate requirement for the position of city manager, and that plaintiff may therefore be fired for political reasons. Second, defendant argues that plaintiff did not engage in protected conduct.

### Termination of Employment for Political Association

#### I. Applicable Law

For more than two decades, the Supreme Court has consistently held that

"the First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved." *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 64, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). Limitations on dismissals based upon a public employee's political affiliation, or political patronage dismissals, emerged from the Supreme Court's decisions in *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). The Court held in *Elrod,* and later emphasized in *Branti,* that "a nonpolicymaking, nonconfidential government employee can [not] be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs." *Elrod,* 427 U.S. at 375, 96 S.Ct. 2673 (Stewart, J., concurring).

In a separate, related line of cases, the Court has employed a balancing test to protect the speech rights of government employees. In *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Court held that some limitations exist on the ability of a government employer to discharge employees based upon the employees' exercise of their right to free expression. In these cases, the Court concluded that the First Amendment precludes a discharge based upon an employee's expression where his speech relates to a matter of public concern, and where his interests outweigh the employer's interest "in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731; *see also Kinsey v. Salado Indep. Sch. Dist.,* 950 F.2d 988, 992 (5th Cir.1992) (en banc) (plurality opinion).

These two lines of cases—the *Elrod/Branti* line protecting the right of political association, and the *Pickering/Connick* line protecting the right to free expression—were synthesized in the Fifth Circuit's decision in *McBee v. Jim Hogg County,* 730 F.2d 1009, 1014 (5th Cir.1984) (en banc). The *McBee* court held that political patronage and public concern speech cases should be balanced as if on a spectrum. *Id.* at 1014. Political patronage cases such as *Elrod* and *Branti,* in which the factors to be evaluated by the court weigh heavily in favor of the employee, are located at one end of the spectrum.[4] These employees are placed at the favorable end of the spectrum because "they [have] not campaign[ed], they [have] not even [spoken]: they [have] merely thought." *McBee* at 1014. Speech cases, such as *Ferguson v. Thomas,* 430 F.2d 852 (5th Cir.1970), and *Duke v. North Texas State University,* 469 F.2d 829 (5th Cir.1972), *cert. denied,* 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973), in which the relevant factors weigh more heavily in favor of the employer because of the effects of the employee's expression, are located at the other end of the spectrum. *Id.* Cases involving both political patronage and

---

4. The Supreme Court recently sanctioned the Fifth Circuit's "spectrum" approach in *O'Hare Truck Service, Inc. v. City of Northlake,* 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996):

    It is true ... that the inquiry [in cases such as *Elrod* ] is whether the [political] affiliation requirement is a reasonable one, so it is inevitable that some case-by-case adjudication will be required even where political affiliation is the test the government has imposed. A reasonableness analysis will also accommodate those many cases ...

where specific instances of the employee's speech or expression, which require balancing in the *Pickering* context, are intermixed with a political affiliation requirement. In those cases, the balancing *Pickering* mandates will be inevitable. This case-by-case process will allow the courts to consider the necessity of according to the government the discretion it requires in the administration and awarding of contracts over the whole range of public works and the delivery of governmental services.
116 S.Ct. at 2358.

speech on a matter of public concern are to be found somewhere in the middle. *Id.* As the Fifth Circuit reiterated in *Kinsey v. Salado Indep. School Dist.,* 950 F.2d 988, 992–93 (5th Cir.1992), both political patronage cases and public concern speech cases are to be analyzed by balancing the interests of the government against those of the employee.[5]

## II. Policymakers and Confidential Employees

The defendant notes correctly that employees in "policymaking" or "confidential" positions receive less First Amendment protection than those not in such positions. The policymaker and confidential employee exceptions have their roots in *Elrod* and *Branti,* where it was held that there was a need for such employees' political views to comport with those of their superiors. "Policymaker" has been defined as a public employee "whose responsibilities require more than simple ministerial competence, whose decisions create or implement policy, and whose discretion in performing duties or in selecting duties to perform is not severely limited by statute, regulation, or policy determinations made by supervisors." *Stegmaier v. Trammell,* 597 F.2d 1027, 1035 (5th Cir.1979). "[C]onsideration should also be given to whether the employee acts as an advisor or formulates plans for the implementation of broad goals." *Gonzalez v. Benavides,* 712 F.2d 142, 149 (5th Cir.1983) (citing *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)).

Much of the parties' disagreement in this case involves the question of whether plaintiff, as city manager of the City of Eagle Pass, can be termed a policymaker, a confidential employee, or both. In accordance with principles of judicial restraint, the issue—one of first impression—of whether a city manager is a policymaker

or confidential employee for purposes of *Elrod* and *Branti* under the law in this circuit will not be decided. Instead, it will be assumed, for purposes of the application of the *McBee* balancing test, that plaintiff was in fact such a policymaker and a confidential employee. As the plaintiff has noted repeatedly, and as is explained below, such a determination does not, by itself, deprive the plaintiff of protection from discharge based on political association. Rather, the *McBee* balancing test, which has its roots in *Connick,* must first be applied.

Under *McBee,* a court evaluating a First Amendment claim by a public employee should, in locating the claim on the spectrum of employee and employer interests, consider whether 'close working relationships are essential to fulfilling [the public employee's] public responsibilities.'" *Id.* at 1016 (quoting *Connick,* 461 U.S. at 151–52, 103 S.Ct. at 1692). Next, if the court finds it essential for such relationships to be close, "it must then determine whether the particular speech [and other conduct] sufficiently disrupted the working relationship as to prevent effective performance, requiring a stronger showing of disruption as the employees' speech moves closer to core 'public concerns.'" *Id.* at 1017 (quoting *Connick,* 461 U.S. at 152, 103 S.Ct. at 1693). In assessing such disruptive effect, a court should consider "the time, place and manner of the political activity" and "whether, taken in context, the particular activity should be considered sufficiently hostile, abusive or insubordinate, as to disrupt significantly the continued operation of the office." *Id.*

In sum, *McBee* requires that each public discharge case, whether it involves speech, political affiliation, or both, "be considered on its particular facts, sifting through such factors and circumstances as the *Connick*

---

**5.** While both types of action receive the same treatment under the *McBee* balancing test, it is noted that in speech cases the employee must initially demonstrate that the speech in question touches on a matter of public con-

cern, whereas in political patronage cases, the court proceeds directly to an analysis of the relative interests of the parties. *Coughlin v. Lee,* 946 F.2d 1152 (5th Cir.1991).

Court outlined in order to strike the proper balance between the employee's speech and associational rights as citizen and the state's right as an employer to loyal and efficient service." *Id.* at 1014. Under *McBee* and its progeny, an allegation that the employee is a policymaker or confidential employee does not take the claim out of the *McBee* balancing framework.[6] Instead, the Fifth Circuit has held that "cases involving public employees who occupy policy maker or confidential positions fall much closer to the employer's end of the spectrum, where government's interests more easily outweigh the employee's First Amendment interests." *Kinsey v. Salado Indep. School Dist.*, 950 F.2d 988, 994 (5th Cir.1992). Having been located on the spectrum, such cases remain subject to *McBee* balancing, in which the disruption caused by or likely to result from the plaintiff's activities plays a significant role.[7] *Id.*

To see the significance of actual or potential disruption to the inquiry, one need only look at the Fifth Circuit's recent decision in *Kinsey v. Salado Indep. School Dist.*, 950 F.2d 988, 992–93 (5th Cir.1992). In that case, a public school superintendent alleged a violation of his First Amendment rights when he was suspended by a school board composed of members who were elected despite his active opposition. The Fifth Circuit, having determined that Kinsey occupied a confidential relationship and high-level policy making position, went on to apply the fact-specific balancing test given in *McBee* to determine that his activities did in fact preclude an effective working relationship with his board. The majority did not apply a straight-forward categorical approach; if they had, Kinsey's claim would have been dismissed on the grounds that he was a policymaker, without regard to the effects of his affiliation on his ability to work with the board.[8] Thus, for plaintiffs in policymaker positions, the balancing approach adopted by the Fifth Circuit in *McBee* and *Kinsey* operates to guarantee that the interests of the employee are

---

6. It is noted that *McBee* itself extended the *Connick* balancing approach to plaintiffs who were discharged solely on the grounds of their political affiliations. For the position that *Connick* balancing has no application to purely political affiliation cases, *see McBee v. Jim Hogg County*, 730 F.2d 1009 (5th Cir. 1984) (Rubin, J., dissenting).

7. It is hardly surprising that the contextual, fact-based balancing inquiry in *Connick*, once having been extended to "mixed" cases involving both speech and political affiliation as in *McBee*, should naturally extend to those cases in which only political affiliation—and therefore the policymaker and confidential employee exceptions given in *Elrod* and *Branti*—is at issue. Were that not the case, a plaintiff seeking redress for discharge from a policymaking position based on his affiliation would receive the benefits of case-by-case balancing only if he had been wise enough to open his mouth. For only with the exercise of his right to free expression would his case be deemed "mixed," and his claim placed upon the *McBee* spectrum, where the effects of his speech and affiliation would be weighed against his First Amendment interests. Without such speech, were pure political affiliation discharges not subject to *McBee* balancing, his case might be dismissed summarily based on his status as a policymaker. In other words, to confine this case and others like it to the realm of categorical analysis would create the following anomaly in the law: policymakers or confidential employees who *speak* (regardless of whether the speech relates to their work) would get the benefit of balancing in political affiliation discharge cases, because their cases are "mixed" under *McBee*, while similarly-situated policymakers or confidential employees who remain *silent* would not receive the added protection of such context-specific balancing, and would risk being entirely without protection under the categorical approach. While such a result might be justified theoretically on various grounds, no such effort will be made without further instruction from the Court of Appeals for the Fifth Circuit.

8. This was precisely the approach taken by the Judges Higginbotham, Politz, Garwood, and Davis, in their concurrence in *Kinsey*. As noted above, the decision in *Kinsey* to apply balancing can not merely be attributed to the fact that Kinsey's case involved both speech and affiliation; as *McBee* makes clear, the balancing approach is to be applied not only to mixed cases, but also to pure political affiliation cases.

weighed against the actual, and not merely inferred, interests of the employer.

Before weighing the specific interests in this case, the law in the Fifth Circuit regarding the applicability of balancing to cases such as this must be reviewed. It is intended that the following survey clarify the reasons behind the decision to apply the *McBee* balancing test, in which the effects of the exercise of First Amendment rights on the workplace are considered, to the facts of this case.

### III. Balancing or Categorization? The Law in the Fifth Circuit

The Fifth Circuit's decision in *Kinsey* to go beyond the category of policymaker to examine and balance the effects of the plaintiff's affiliation and speech on his job performance was, at least in part, a response to recent efforts by the Supreme Court to temper the categorical approach first articulated in *Elrod*. In *Branti v. Finkel*, the Supreme Court expressly rejected the categorical approach, explaining that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for effective performance of the public office involved." *Branti*, 445 U.S. at 518, 100 S.Ct. at 1294. While not every circuit has interpreted this language in *Branti* to require case-by-case consideration of the effects of the claimant's speech or affiliation on the working relationship or on job performance,[9] recent Fifth Circuit cases decided by panels both before and after *Kinsey* evidence such a trend. Due to the cumulative impact of these cases, defendant's reliance on *Stegmaier v.*

*Trammell,* 597 F.2d 1027 (5th Cir.1979), a pre-*Branti* case upholding the constitutionality of a public discharge without a balancing of the effects of political affiliation on job performance or working relationships, is misplaced.

The tension between balancing and categorization was first apparent in the case of *Gonzalez v. Benavides,* 712 F.2d 142 (5th Cir.1983), *appeal after remand,* 774 F.2d 1295 (5th Cir.1985). In *Gonzalez I,* an executive director of community action agency challenged his discharge by county commissioners. A Fifth Circuit panel remanded the case to the district court for consideration of whether the director's position "fell into the narrow band of fragile relationships" excepted categorically in *Elrod. Id.* at 148. On appeal after remand, a second panel affirmed the district court's finding that Gonzalez occupied a policymaking position, applied the *Pickering* balancing test to arrive at the conclusion that his work performance was not undermined by his speech, and held for the plaintiff. In a footnote, the panel noted that the determination that the plaintiff was a policymaker suggested "that [he] might have been dismissed because of his party affiliation under *Elrod* and *Branti*. We need not, and do not, express an opinion on this question." 774 F.2d 1295, 1302 n. 12. As was noted in the dissent in *McBee* and concurrence in *Kinsey,* see notes 6 and 8, *supra,* a holding that Gonzalez could in fact have been fired under *Elrod* or *Branti* based on his status as a policymaker would have, under one interpretation of the law, obviated the need for further inquiry or balancing; the court, however, refrained from so holding, choosing instead not to resolve the tension between the two lines of cases.

---

9. *See Regan v. Boogertman,* 984 F.2d 577, 580 (2nd Cir.1993) ("[W]e do not merely look at her actions taken while in office. Rather, we also look at the power with which she is vested by law, and which is inherent in the office."); *Williams v. City of River Rouge,* 909 F.2d 151, 154 (6th Cir.1990) ("When examining a public office for first amendment protection against politically-motivated dismissal,

the relevant focus of analysis is the inherent duties of the position in question, not the work actually performed by the person who happens to occupy the office." (citations omitted)); *Meeks v. Grimes,* 779 F.2d 417, 419 n. 1 (7th Cir.1985) ("[O]ur focus is on the 'inherent powers' of the office, not what any individual officeholder actually does.").

Several years later, in *Soderstrum v. Town of Grand Isle*, 925 F.2d 135 (5th Cir.1991), the Fifth Circuit held that "an incoming government official should be able to choose his personal secretary and should not be prevented by the First Amendment from replacing his defeated opponent's secretary and relative, *at least when that person, as in this case, has unambiguously expressed her lack of confidence in the incoming official and her unwillingness to work in the new administration.*" 925 F.2d at 141 (emphasis added). In *Soderstrum*, the court was careful to ground its opinion in the context of the plaintiff's unwillingness to work and disruptive conduct. As in *Gonzalez*, because Soderstrum was found to be a confidential employee, had the court employed a categorical approach, her discharge would have been constitutional regardless of the actual effects of her affiliation. Yet, as in *Gonzalez*, the court's analysis was immersed in the context, circumstances, and the actual impact of the particular plaintiff's affiliation.

After *Kinsey*, two cases, both decided in 1995, further evinced the Circuit's affinity for balancing in public discharge cases, even in instances involving policymakers. In *Vojvodich v. Lopez*, 48 F.3d 879 (5th Cir.1995), a deputy claimed that he was transferred because of his political activity and affiliation. The trial court granted summary judgment for the defendant sheriff, holding that because the deputy occupied a policymaking position, his First Amendment rights were automatically outweighed by the sheriff's interest in having loyal employees. On appeal, the Fifth Circuit warned that each case should be considered on its particular facts, stating unequivocally that "[a]lthough the fact that a public employee holds a policymaking position is relevant to the required balancing of interests, it is not the ultimate determination." *Id.* at 884. Missing, said the court, was a showing that the plaintiff's political affiliation actually affected the functioning of his office, or was likely to do so. *Id.* at 885. Similarly, in *Brady v. Fort*

*Bend County*, 58 F.3d 173 (5th Cir.1995), the Fifth Circuit held that the Fort Bend County Sheriff was not entitled to qualified immunity because his refusal to rehire deputy sheriffs who supported his political opponent violated the clearly established legal principle that "a public employer cannot retaliate against an employee for expression protected by the First Amendment merely because of that employee's status as a policy maker." This conclusion was based on the court's observation that such retaliation could not possibly comport with the First Amendment without a showing of a "disruption of governmental functions." *Id.* at 176 (citing *Vojvodich* at 887).

## VI. Application

Based on the developments in the law outlined above, the facts of this case will be scrutinized with an eye toward disruption of the workplace, or potential future disruption, stemming from plaintiff's political affiliation. Each of these cases "must be considered on its particular facts." *McBee*, 730 F.2d at 1014. The evidence before this court indicates that the plaintiff made no expressions, ambiguous or otherwise, of any lack of confidence in the incoming officials or of her unwillingness to work in the new administration. In fact, her uncontroverted testimony was that she was ready, willing, and able to work with the new council majority. Additionally, the plaintiff testified that she made efforts to let the new members of the council know that she wanted to work with them. Based on these facts and others produced at trial, no evidence is found of actual disruption or potential for disruption resulting from plaintiff's affiliation.

The defendant places much emphasis on the employment position at issue in *Kinsey*, and its similarity to the instant case. While the relationship between the city manager and the city council bears some resemblance to the relationship between the school superintendent and school

board discussed at length in *Kinsey*, the circumstances surrounding plaintiff's employment could not be more different. Kinsey's association and position in the elections was well known. As he himself admitted, he expressed his concerns about the members of the school board who eventually became his superiors to anyone who asked him, and on numerous occasions. He published a letter to the newspaper demonstrating his support for the school board candidates who opposed his eventual superiors. After finding that the position of superintendent required the ability to work closely with the board, the Fifth Circuit turned to the question of whether Kinsey's activities "sufficiently disrupted the [close] working relationship as to prevent effective performance." *Kinsey*, 950 F.2d at 996 (quoting *McBee*, 730 F.2d at 1017). Based on the above listed facts demonstrating actual and potential disruption, the court answered in the affirmative.

■ Unlike the defendant in *Kinsey*, the defendant in this case has presented no credible evidence that plaintiff's affiliation disrupted, or was likely to disrupt, her workplace. It is found that there has been no adequate showing of an affiliation impinging on her relationship with the council, or on her future effectiveness as city manager. Accordingly, based on the cases discussed at length above, it is found that plaintiff's exercise of her First Amendment rights did not interfere with, or evince a potential for interference with, the city's effective provision of public services. This finding is made without determining the plaintiff's status as a policymaker or confidential employee, as such a determination would not obviate the need for a balancing, under *McBee*, of the plaintiff's First Amendment rights against the interests of the defendant. Even assuming that plaintiff is both a policymaker and a confidential employee,[10] it is determined

that the balance tips in favor of the plaintiff. As the Fifth Circuit commented in *McBee*, "the Constitution has not repealed human nature; and it is one thing to work with a subordinate who has expressed a reasoned preference for another superior and quite another to have forced on one's organization and individual who has blackguarded one's honesty and ability up and down the county." *Id.* at 1017. To this it might be added, it is yet another thing to discharge a worker who has expressed no ill will at all.

### Protected Conduct

■ Perhaps anticipating the finding that disruption, actual or potential, is absent from the record in this case, the defendant next urges that the plaintiff did not engage in any protected First Amendment activity. Defendant cites *Jones v. Collins*, 132 F.3d 1048, 1052–55 (5th Cir. 1998), a case in which a superintendent's alleged retaliation against a principal for making public statements was held not to be in violation of the First Amendment because the principal himself denied having made the statements. While *Jones* involved speech and not political affiliation, defendant also cites to a more recent Fifth Circuit case, *Steadman v. Texas Rangers*, 179 F.3d 360 (5th Cir.1999), in which the court found no First Amendment violation because the plaintiff presented inadequate proof of having engaged in speech or political activities. Although *Steadman* arguably extended the scope of *Jones* to cases involving political affiliation, the court in *Steadman* was careful to emphasize that a political affiliation claimant need only show that he or she was dismissed on the basis of his or her political affiliation or non-affiliation:

> Indeed, the Supreme Court has never required that an individual "speak out" in order to find shelter under the First Amendment. Where lower-level gov-

---

**10.** It is noted that such a finding would be highly unlikely, given the facts discussed in relation to the policymaking and personal

staff exceptions under Title VII, *supra*, at pages 1003–07.

ernment employees have been punished because of their political beliefs and associations, the Court has held that their First Amendment rights were violated. *See Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).... The Court found that "there is no requirement that dismissed employees prove that they, or other employees, have been coerced into changing, either actually or ostensibly, their political allegiance;" they must merely show that they were "discharged because they were not affiliated with or sponsored by" a particular party. *Branti,* 445 U.S. at 517, 100 S.Ct. 1287. Following the same logic, if an employee is discharged because of her affiliation with a party, she also would be protected.

*Steadman,* 179 F.3d at 367 (footnotes omitted). The burden articulated above has clearly been met in this case. The plaintiff in *Steadman* "never produced any evidence showing an outward sign of her [affiliation]." *Id.* In contrast, it is clear from the cumulative evidence and witness testimony in this case that although plaintiff did not actively campaign on behalf of a particular faction of the council in the election preceding her removal (perhaps because of a city charter prohibition on the engagement in politics by city employees), she was affiliated with the losing faction and, as was perhaps more aptly demonstrated by the evidence, *not* affiliated with the victors who eventually fired her. Therefore, the defendant's final proposed basis for judgment as a matter of law is rejected.

"The spoils system, which views public employment as pure political patronage, inhibits the free functioning of the electoral process... By holding a public employee's job hostage to his political activities or affiliation, the rebirth of the spoils system ... allows an incumbent or a victorious challenger to accomplish indirectly what neither could legally do by mandate: the coercion of political support from the public employee." *McBee* at 1017–18 (Rubin, Randall and Higginbotham, JJ., dissenting.) For the above reasons, defendant's motion for a judgment as a matter of law should be **DENIED**.

### *FINAL JUDGMENT*

Based upon the findings of fact and conclusions of law set forth in the Memorandum Opinion of the court, which has been filed simultaneously herewith, it is

**ORDERED** and **ADJUDGED** that the plaintiff, Susana Gomez, recover of and from the defendant, City of Eagle Pass, Texas, the sum of $175,000.00 in actual damages, plus $8,700.00 in back pay, plus $3124.54 in prejudgment interest, and her costs of action.