**Edgardo A. GONZALEZ, Jr.,**
**Plaintiff-Appellee,**

v.

**C.Y. BENAVIDES, Jr., Webb County Judge, et al., Defendants-Appellants.**

**No. 84–2440.**

United States Court of Appeals,
Fifth Circuit.

Oct. 24, 1985.

Rehearing Denied Nov. 21, 1985.

---

Richard Morales, Sr., Laredo, Tex., for Webb Comm's Court & Webb County.

Lawrence A. Mann, Laredo, Tex., for Benavides & Webb County Comm.

Oscar M. Laurel, Jr., Laredo, Tex., for plaintiff-appellee.

Before WISDOM, POLITZ and TATE, Circuit Judges.

## OPINION

WISDOM, Circuit Judge.

In this case, before us for the second time,[1] we must balance a public employee's right to free speech against a public em-

ployer's interest in the effective and efficient performance of the agency the employee serves. In affirming the district court, we strike the constitutional balance in favor of the employee.

### I.

Plaintiff Edgardo Gonzalez was Executive Director of the Laredo-Webb County Community Action Agency (CAA). The CAA administers a variety of federally funded anti-poverty programs in Webb County, Texas. Congress created community action agencies to involve local residents, including representatives of the poor and business and civic leaders, in developing and carrying out policies to reduce poverty. *See* H.Rep. No. 1458, 88th Cong. 2nd Sess., *reprinted in* 1964 U.S. Code Cong. & Ad.News 2900, 2945. In 1967, Congress amended the Economic Opportunity Act to create a larger role for local elected officials. *See* H.Rep. No. 866, 90th Cong. 1st Sess., *reprinted in* 1967 U.S.Code Cong. & Ad.News 2428, 2448–49. The 1967 amendments permit states or political subdivisions of states to designate themselves as community action agencies. 42 U.S.C. § 2790(a). If the state or political subdivision does so, it must create an "Administering Board" composed of equal numbers of representatives of the poor, representatives from "major groups and interests in the community", and elected officials. 42 U.S.C. § 2791(b). The Webb County Commissioners' Court designated itself as the community action agency for Webb County. The commissioners created an Administering Board of 21 persons and approved a set of regulations to govern the operations of the CAA. The Commissioners' Court appointed the senior staff of the CAA, including the Executive Director and the Deputy Director. The commissioners also reviewed policies, plans, and regulations developed by the staff and the Administering Board, and ratified the minutes of Administering Board meetings. The Administering Board oversaw CAA planning and administration. We accept the district

---

1. *See Gonzalez v. Benavides,* 5 Cir.1983, 712 F.2d 142 (*Gonzalez I*).

court's finding that the Administering Board "was clearly charged with the day-to-day supervision of Gonzalez and explicitly directed to evaluate his job performance."

Gonzalez began working for the predecessor of the CAA, the Webb County Economic Opportunities Development Corporation, in 1969. He became Executive Director of the CAA in March 1979. In May of 1980, Gonzalez discharged the Deputy Director of the CAA, Oscar Chavez. The County Commissioners' Court reinstated Chavez, publicly reprimanded Gonzalez for exceeding his authority, and began an investigation of Gonzalez's job performance.

Gonzalez appeared before the Commissioners' Court and stated publicly that the investigation violated CAA regulations. During a lengthy closed session following his public statement, Gonzalez maintained that he was specifically authorized to dismiss any employee under a regulation approved by the commissioners.[2] Gonzalez apparently did not contest the commissioners' power to reinstate the Deputy Director. Instead, he objected that Chavez had not appealed first to the Administering Board, as required by the regulations.[3]

Gonzalez conceded that the Commissioners' Court had the power to fire him with or without cause.[4] He insisted, however, that the regulations deprived the Commissioners' Court of authority to evaluate the Executive Director's job performance.[5] The commissioners argued that their power to fire Gonzalez necessarily included the power to evaluate him. They demanded that Gonzalez publicly acknowledge their authority to evaluate his performance.[6] Gonzalez refused, and the commissioners fired him.

▆▆▆ Gonzalez brought suit under 42 U.S.C. § 1983, contending that his termination was an unconstitutional retaliation for protected speech and a violation of protected liberty and property interests. The district court rejected the due process claims, but concluded that Gonzalez's statements were protected by the First Amendment and awarded damages.[7] Employees may recover for actions taken by government employers in retaliation for protected speech even if the employee has no protected liberty or property interest in his job. *Mount Healthy City Board of Education v. Doyle,* 1977, 429 U.S. 274, 283–84, 97 S.Ct. 568, 574–75, 50 L.Ed.2d 471.

**2.** Gonzalez relied on a CAA regulation providing, in part: "Any employee may be dismissed by the Executive Director ... for cause". *Policies and Procedures, Laredo-Webb County Community Action Agency* ch. XVI § 7.

**3.** Gonzalez maintained that Chavez was obliged to follow the CAA's personnel grievance procedure. That procedure calls for an appeal in writing to the Administering Board. *Id.* ch. XVII § 3(3).

**4.** Our impression in the earlier case that Gonzalez "den[ied] the core authority of the commissioners to fire him", *Gonzalez I,* 712 F.2d at 146, was mistaken. The district court so found. Indeed, another CAA regulation states that the Executive Director serves at the pleasure of the Commissioners' Court. *See Policies and Procedures, Laredo-Webb County Community Action Agency* ch. XIX § 1.

**5.** Gonzalez cited a regulation providing that '[t]he performance evaluation of the Executive Director shall be made by the Administering Board." *Id.* ch. XII § 1. He maintained that the wording of the regulation precludes evaluation by any other body.

**6.** The defendants suggest that the commissioners merely asked Gonzalez to recognize that their view differed from his. The district court, however, found that the commissioners required Gonzalez to accept their view. Our reading of the record supports the district court's finding. Gonzalez was unlikely to have risked his job simply to deny that the commissioners actually held the view they purported to hold.

**7.** Employees wrongfully dismissed for exercising their First Amendment rights generally are entitled to backpay and reinstatement, *see Kingsville Indep. School Dist. v. Cooper,* 5 Cir. 1980, 611 F.2d 1109, 1114, as well as attorney's fees, *see Stolberg v. Members of Bd. of Trustees,* 2 Cir.1973, 474 F.2d 485, 490, and punitive damages for dismissals in bad faith, *see Donahue v. Staunton,* 7 Cir.1972, 471 F.2d 475, 482, *cert. denied* 410 U.S. 955, 93 S.Ct. 1419, 35 L.Ed.2d 687 (1973). Gonzalez, however, has found another job at a slightly lower salary, while the County Court has hired a new Executive Director. The parties therefore agree that Gonzalez should recover only lost income and attorney's fees.

On appeal, we observed that Gonzalez apparently had wide discretion to carry out or subvert the policies of elected officials, and remanded so that the district court could determine whether the Executive Director's relationship with the Commissioners' Court fell "into that narrow band of fragile relationships requiring for job security loyalty at the expense of unfettered speech". *Gonzalez I*, 712 F.2d at 150. We remanded the case to the district court to determine whether such a fragile relationship existed and if so, whether Gonzalez's speech undermined the relationship.[8]

In an unpublished opinion, the district court found that Gonzalez occupied a sensitive policymaking position, but concluded that his speech was protected because it caused no significant harm to his relationship with the commissioners.

## II.

■ The Supreme Court has rejected the sweeping proposition that public employees may be required to surrender First Amendment rights as a condition of employment. *See Keyeshian v. Board of Regents*, 1967, 385 U.S. 589, 605–06, 87 S.Ct. 675, 684–85, 17 L.Ed.2d 629. Shortly after it handed down the *Keyeshian* opinion, the Court concluded that government employees are not always free to speak as private citizens. *Pickering v. Board of Education*, 1968, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811. The balancing test announced in *Pickering*, although simply stated, is often difficult and uncertain of application. *Pickering* instructs us to strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public con-

cern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S.Ct. at 1734. The *Pickering* Court suggested some factors to be weighed in the balance: whether the statements were directed against persons with whom the speaker "would normally be in contact in the course of his daily work"; whether they had an adverse effect on "discipline by immediate superiors or harmony among coworkers"; whether "it can persuasively be claimed that personal loyalty and confidence are necessary" to a successful employment relationship; whether the employee's statements "either impeded [the] proper performance of his daily duties ... or ... interfered with the address operation of the [agency]"; and whether the statements addressed a matter of public concern. *Id.* at 568–73, 88 S.Ct. at 1734–37.

■ The Court refined the *Pickering* analysis in *Connick v. Myers*, 1983, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708. Under *Connick*, the employee's speech is entitled to judicial protection only if it addresses a matter of public concern. The Court reasoned that "speech concerning public affairs" is entitled to greater judicial protection because it "is more than self-expression; it is the essence of self-government". *Connick*, 461 U.S. at 145, 103 S.Ct. at 1689, *quoting Garrison v. Louisiana*, 1964, 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125. Public employees, by virtue of their public employment, may make valuable contributions to the public debate. *See Pickering*, 391 U.S. at 572, 88

---

**8.** We said:

On remand the trial court is free to take additional evidence. It should first decide from the facts whether in Gonzalez's relationship with the county commissioners his true position and power were such as to implicate the governmental interest we describe. If such an interest is implicated the trial court should then weigh that interest against the asserted rights of free speech. That weighing is required because we do not decide that all speech by persons in such relationships is unprotected. Rather, the speech must be weighed against its impact upon the relation-

ship and that relationship's role in the elected official's discharge of his duties.

In this weighing one must look at what was said. We are wary of reviewing content in an *a priori* inquiry into entitlement to protection but that does not mean that content is irrelevant to the balancing exercise. In *Connick* the Court analyzed the nature of the asserted speech in determining its relevance to public issues. We require that here. The able trial judge has approached this case in a sensitive and thoughtful manner. We are reluctant to ask him to continue that effort, but we must do so. 712 F.2d at 150.

S.Ct. at 1736–37. The majority in *Connick* held that, if the employee commented on matters of only personal interest, the employee's discharge is not subject to First Amendment review "absent the most unusual circumstances". 461 U.S. at 147, 103 S.Ct. at 1690. Employee speech, even on issues of public concern, must be balanced against the government's interest in "promot[ing] efficiency and integrity in the discharge of official duties" and in "maintain[ing] proper discipline in the public service". *Connick*, 461 U.S. at 150–51, 103 S.Ct. at 1692, *quoting Ex parte Curtis*, 1882, 106 U.S. 371, 373, 1 S.Ct. 381, 383–84, 27 L.Ed. 232. The *Connick* Court considered whether the employee's speech impeded her ability to carry out her job; whether close working relationships with superiors were disrupted; and the time, place, and manner of the speech. 461 U.S. at 151–53, 103 S.Ct. at 1692–93.

Both *Connick* and *Pickering* emphasize that the Supreme Court's enumeration of factors to weigh in the balance is not exhaustive. *See* 461 U.S. at 153, 103 S.Ct. at 1693; 391 U.S. at 569, 88 S.Ct. at 1735. When we first considered this case, we identified an additional factor that may limit the employee's right to speak freely. We noted that senior government employees who exercise broad discretionary authority may be able to "make or break" the programs and policies of elected officials. *Gonzalez I*, 712 F.2d at 149. We analogized the interest at stake to the government's interest in the party affiliation of some employees. *Id.* at 147–49. *Cf. Branti v. Finkel*, 1980, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574; *Elrod v. Burns*, 1976, 427 U.S. 347, 96 S.Ct. 2673, 49

L.Ed.2d 547.[9] We concluded that the speech rights of such employees might have to be curtailed to safeguard the political process.

### III.

■ We now apply the *Pickering-Connick* scheme to the Gonzalez case. Although this Court will not disturb the district court's findings of fact unless they are clearly erroneous, we must weigh the facts for ourselves to arrive at an "independent constitutional judgment". *See Connick*, 461 U.S. at 150 n. 10, 103 S.Ct. at 1692 n. 10, *quoting Jacobellis v. Ohio*, 1964, 378 U.S. 184, 190, 88 S.Ct. 1676, 1679, 12 L.Ed.2d 793 (opinion of Brennan, J.).

The defendants concede that Gonzalez was fired because of his speech. The plaintiff therefore satisfies the causation requirement established in *Mount Healthy City Board of Education v. Doyle*, 1977, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471.

### A.

■ Whether Gonzalez commented upon matters of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record". *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690–1691.[10] We are mindful of *Connick's* admonition that not every conflict between public servants should be elevated to an issue of public concern. *Id.* at 149, 103 S.Ct. at 1691. Gonzalez's disagreement with the commissioners indisputably was a matter of concern to Gonzalez as an employee. We do not read *Connick*, however, to exclude the possibility that an issue of private concern

---

9. Our analogy does not conflate the categorical approach of the political affiliation cases with the individualized balancing required in employee speech cases. We simply identified an additional government interest to be weighed in the balance. This court has since viewed employee speech and employee party affiliation as endpoints on a single continuum. *See McBee v. Jim Hogg County*, 5 Cir.1984, 730 F.2d 1009 (en banc). *McBee* is unnecessary to our analysis here.

10. The dissenters in *Connick* object that the majority's formulation weighs "context" twice, first to determine whether the speech addressed an issue of public concern, and then to balance the interests of speaker and government. 461 U.S. at 159–61, 103 S.Ct. at 1696–97. We do not see the force of this objection. Case-by-case adjudication requires consideration of "the whole record", including the "context" of the speech, to determine whether the speaker addressed an issue of actual, as opposed to merely potential, public concern.

to the employee may also be an issue of public concern. Indeed, the teacher dress code at issue in *Mount Healthy*, and the school bonds under discussion in *Pickering*, appear to have been "mixed" issues of both public and private concern. *See The Supreme Court, 1982 Term*, 97 Harv.L. Rev. 70, 171 (1984). We are persuaded that Gonzalez raised such a mixed issue.

■ First, Gonzalez raised the possibility that violations of CAA regulations would result in a loss of federal funds for poverty programs in Webb County.[11] Federal policy favors ensuring that representatives of the poor participate in policymaking. *See* 42 U.S.C. § 2791(b). The direct intervention of the county commissioners contravened this policy. Although the Administering Board ratified the action of the Commissioners' Court by a vote of eight to seven, the result might have been different if the Board had been consulted before the commissioners acted. Had federal funding been cut off, thousands of needy Webb County residents would have lost over a million dollars a year in federal assistance. While such a catastrophe may have been unlikely, we believe the importance of the programs at stake raised the issue to a matter of significant public concern.

■ Second, whether the Commissioners' Court complied with CAA regulations is a question of public concern. The regulations relied on by Gonzalez were ratified by the County Court itself. While Gonzalez's reading of the regulations is not indisputably correct, he raised legitimate questions of interpretation. We consider that compliance with the regulations by the Commissioners' Court is a matter of significant public concern.

■ Third, the uncertain allocation of authority and responsibility among the County Court, the CAA's Administering Board, the Executive Director, and the Deputy Director was a matter of public concern. That uncertainty resulted in this expensive and time-consuming lawsuit. Even before Gonzalez fired his deputy, this uncertainty generated friction and reduced the efficiency of the agency.

### B.

Because we agree with the district court's conclusion that Gonzalez's speech raised issues of significant public concern, we next consider the government interest at stake.

In *Connick*, the Court found that a close working relationship with superiors was essential to the employee's job. 461 U.S. at 152, 103 S.Ct. at 1693. This case is different. The district court found that Gonzalez's job did not require frequent meetings with the Commissioners' Court. The Administering Board monitored the performance of Gonzalez and his staff; the Commissioners' Court generally limited its involvement to ratifying the minutes of Administering Board meetings.

We noted, however, that a senior executive employee might be required to curtail his speech even though that employee does not have a close working relationship with elected officials. *Gonzalez I*, 712 F.2d at 148. We asked the trial judge to consider whether Gonzalez's relationship to the Commissioners' Court was particularly fragile because Gonzalez was in a position to frustrate policies on which the commissioners may have based their election campaigns. *Id.* at 149–50. The district court found that Gonzalez occupied a "policymak-

---

**11.** In 1969, the Office of Economic Opportunity (superseded by the Community Services Administration in 1974) issued a memorandum stating that any community action agency failing to comply with the requirements of the statutes risked loss of federal funding. The memorandum stated that persistent failure to consult the Administering Board might result in loss of funding. Community Action Memorandum No. 81 at 8. A 1979 "instruction" from the Community Services Agency requires that the Adminis-

tering Board must participate in the selection of the Executive Director. CSA Instruction 6400-01a. Gonzalez neglected to tell the Commissioners' Court about the more recent regulation before his final interview with them. We do not think Gonzalez's failure, however culpable, decreases the public importance of the issue he raised. Moreover, the earlier memorandum raised the possibility that failure to consult the Administering Board would result in a loss of funds.

ing" position giving rise to such a fragile relationship.

.**[13]** In considering party affiliation as a qualification for public employment, the Supreme Court has concluded that the "policymaking" label is not always decisive. *Branti v. Finkel,* 1980, 445 U.S. 507, 518, 100 S.Ct. 1287, 1294–95, 63 L.Ed.2d 574. In this instance, we think that the policymaking nature of Gonzalez's position is highly relevant to the question whether he could defeat the political program of elected officials. Gonzalez exercised broad discretion over the whole range of CAA programs. Although the evidence suggests that CAA policies often were developed by the Administering Board rather than the Commissioners' Court, CAA programs were a crucial political concern of the county commissioners.[12] We will not disturb the district court's finding on this issue.

## C.

■ Finally, we must weigh the government's interest in the loyalty of a key executive employee against the employee's speech rights. "That weighing is required because we do not decide that all speech by persons in such relationships is unprotected. Rather, the speech must be weighed against its impact upon the relationship and that relationship's role in the elected official's discharge of his duties." *Gonzalez I,* 712 F.2d at 150.

"[T]he [government's] burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Connick,* 461 U.S. at 150, 103 S.Ct. at 1691–92. In *Connick,* the Court held that the public employer was justified in dismissing the employee because the employer reasonably believed the employee's speech was likely to disrupt its operations. 461 U.S. at 152, 103 S.Ct. at 1693. The majority carefully noted, however, that a

stronger showing of disruption may be necessary if the employee's speech more substantially involves matters of public concern. *Id.* We have concluded that Gonzalez directly addressed matters of substantial public concern. We conclude, moreover, that the defendants have not made even the lesser showing required in *Connick.*

The defendants offered no evidence to show that Gonzalez's speech was likely to undermine the commissioners' political program. Gonzalez's refusal to acquiesce posed no immediate threat to the operation of the CAA. Gonzalez did not refuse to carry out the County Commissioners' directives so long as they were consistent with CAA regulations. The district court found that there was "absolutely no evidence or contention that Gonzalez refused to abide by" the commissioners' decision. He offered to help amend the regulations to suit the commissioners. There is no suggestion that the commissioners' policies were in such imminent danger that there was no time to amend the procedures to settle the dispute.

Gonzalez did not challenge the commissioners' power to fire him. He did not deny that the Commissioners had authority to reinstate Deputy Director Chavez; Gonzalez merely insisted that he had the authority to fire Chavez in the first place, and that Chavez should have followed regulations by appealing to the Administering Board. Gonzalez did not attempt to obstruct the commissioners' investigation; he merely protested that the commissioners were violating agency regulations.

The defendants argue that Gonzalez's refusal to acquiesce was a challenge to their authority. That argument begs the question. If the commissioners acted contrary to CAA procedures, as Gonzalez maintains, they exceeded the authority allocated to them by regulations the Commissioners'

---

**12.** Our analysis suggests that the Executive Director might have been dismissed because of his party affiliation under *Elrod* and *Branti.* We need not, and do not, express an opinion on this question. We note, however, that Congress has expressed a preference for insulating community action agencies from some local political pressures, and that the Community Services Administration now requires Administering Board participation in the selection, if not the dismissal, of the Executive Director.

Court itself had approved. Gonzalez merely stated that, in his opinion, the commissioners were acting *ultra vires.*

Following his public statement, Gonzalez spoke in closed session. His speech retains its protected status. *See Givhan v. Western Line Consolidated School District,* 1979, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619. "When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message, but also by the manner, time, and place in which it is delivered." *Id.* 439 U.S. at 439 n. 4, 99 S.Ct. at 701 n. 4. We agree with the district court's conclusion that "there was nothing about the manner, time or place of Gonzalez's statement that would justify his dismissal". Gonzalez was polite throughout his exchanges with the Commissioners' Court. He did not launch personal attacks on the commissioners. At several points he offered to cooperate in amending the CAA procedures to meet the commissioners' wishes. As the district court found, Gonzalez's conduct could not be characterized as a "mini-insurrection". *Cf. Connick,* 461 U.S. at 141, 103 S.Ct. at 1687. The time and place were selected by the commissioners, who began their investigation with little warning to Gonzalez.

The district court found that Gonzalez's loyalties were divided. On the one hand, he served at the pleasure of the Commissioners' Court, which sought direct control over the CAA. On the other hand, Gonzalez was obliged to carry out federal policies designed to remove the CAA from local political influence. This conflict accurately describes Gonzalez's predicament. It is pertinent, but we need not rely on this finding because we conclude that Gonzalez's speech was entitled to First Amendment protection even if the Commissioners' Court is viewed as the sole government employer.

IV.

Our discussion suggests the familiar disadvantages of case-by-case balancing of First Amendment rights. Examination of the facts is difficult and time-consuming. In many cases judges are free to decide the case on a hunch. Because of this unpredictability, individualized balancing inevitably chills some protected speech even as it discourages government officials from acting vigorously against some unprotected speech. *See* T. Emerson, *Toward a General Theory of the First Amendment.* 72 Yale L.J. 877, 913–14 (1962). Nevertheless, because public employees speak in a great variety of circumstances, individualized balancing seems preferable to a predictable but inflexible categorical approach. And in the context of such cases great reliance should be placed on the judicial discretion exercised by the trial judge in the fact-finding process. Here, on remand the trial judge faithfully followed the clear but demanding mandate of *Gonzalez I.*

For the reasons we have discussed, the judgment of the district court is AFFIRMED.