Roger Howell MYERS, Plaintiff,

v.

CITY OF HIGHLAND VILLAGE, TEXAS; Edward O'Bara, individually and as Chief of Police; and Conrad Bahr, IV, individually and as Captain of Police, Defendants.

Kevin Ray Hall, Plaintiff,

v.

City of Highland Village, Texas; Edward O'Bara, individually and as Chief of Police; and Conrad Bahr, IV, individually and as Captain of Police, Defendants.

Nos. 4:02–CV–31, 4:02–CV–36.

United States District Court,
E.D. Texas,
Sherman Division.

June 23, 2003.

Jane Elizabeth Bishkin, Dallas, TX, for Plaintiffs.

Dennis J. Eichelbaum, Schwartz & Eichelbaum, Frisco, TX, for City of Highland Village, Texas.

Parker Douglas Young, Figari, Davenport, & Graves, LLP, Dallas, TX, Dennis J. Eichelbaum, Schwartz & Eichelbaum, Frisco, TX, for Edward O'Bara & Conrad Bahr, IV.

1. The City has filed an Amended Motion for Summary Judgment (Docket No. 53).

2. On April 2, 2003, the Court was advised that Hall settled his claims with the City and currently has filed a Stipulation of Dismissal (Docket No. 51). Accordingly, the Court will not be concerned with the City's Motion for Summary Judgment as to Hall's claims.

## MEMORANDUM OPINION AND ORDER

DAVIS, District Judge.

Defendants City of Highland Village (the "City") and Edward O'Bara ("O'Bara") have filed Motions for Summary Judgment (Docket Nos. 41 & 52).[1] Plaintiff Roger H. Myers ("Myers") has filed a Response (Docket Nos. 43, 60, & 68). For the foregoing reasons, the Court finds that Defendant's Motions for Summary Judgment should be **DENIED**.

## BACKGROUND

Plaintiffs Kevin Hall ("Hall")[2] and Myers were police officers with the City. Myers joined the Highland Village Police Department ("Police Department") as a police officer on December 19, 1995. On May 29, 2000, Myers was promoted to the rank of Sergeant with the Police Department. Prior to his promotion to Sergeant, Myers was disciplined for violations of the rules and regulations of the City and the Police Department on three separate occasions. After his promotion, he was disciplined for misconduct on six separate occasions.

In September 2001, Anthony Satriano ("Satriano"), a police officer, hired a local realtor named Fred Placke ("Placke") to assist him in purchasing a home because he did not have sufficient funds to contribute to the down payment. Placke offered to assist Satriano by giving him the necessary funds for his down payment. However, Placke, as real estate agent, was prohibited from giving the gift directly to Satriano. Accordingly, Placke looked for an organization by which he could donate

the money and then the organization would then remit the money to Satriano's title company as the down payment.

Apparently, in October 2001, Placke approached Highland Village Police Department Chief of Police Edward O'Bara ("O'Bara") and asked his assistance in using the Highland Village Police Auxiliary ("Auxiliary") or some other organization as a vehicle for the down payment gift. O'Bara directed Placke to the Auxiliary. In late October 2001, O'Bara informed Susan Vaughn ("Vaughn"), the Auxiliary member in charge of the Auxiliary's bank account, that Placke was looking for an organization to donate a portion of his commission to Satriano and suggested the Auxiliary should be used for this purpose. Vaughn agreed and on November 9, 2001, Placke issued a check made payable to the Auxiliary to Vaughn. Subsequently, Vaughn deposited the check in the Auxiliary's bank account and obtained a certified check payable to Satriano's title company and gave the certified check to Placke. O'Bara vehemently denies that he was involved in the Satriano transaction.

The real estate transaction was completed on November 16, 2001. On November 19, 2001, O'Bara claimed to first learn of the Auxiliary's involvement in the Satriano transaction and notified the City's Human Resource Director. After much discussion between O'Bara, the Human Resource Director and the City Manager, Betty Webb ("Webb"), it was decided an investigation should be undertaken to determine whether city police violations occurred. It was further decided that Satriano should repay the gift to Placke because such a gift violated the gratuity provision of the City's ethics ordinance.

On the morning of November 21, 2001, O'Bara visited with Myers and informed him of the events surrounding the Satriano transaction. O'Bara denied involvement in the transaction. Myers grew suspicious of O'Bara's repeated denials. Immediately after speaking with O'Bara, Myers approached Sergeant Sherri Morrison who informed Myers that O'Bara had approved the use of the Auxiliary. Approximately one hour later, Myers was ordered by Captain Conrad Bahr[3] to turn over the Highland Village Police Association ("Association") treasury funds to the City.[4] Myers objected several times, but was told he would be subject to discipline if he did not comply. Over the next couple hours, Myers spoke to at least two other coworkers regarding the legality of the order to turn over the Association funds, includ-

---

**3.** O'Bara instructed Bahr to have Myers turn over the Association funds. Although not relevant to the Court's analysis in this opinion, the Court notes that O'Bara testified that he was concerned about the financial dealings of the Association. In particular, before O'Bara's arrival as Police Chief in 2000, the Association purchased leather jackets for its members with charitable funds. When O'Bara questioned Myers regarding the financial records, Myers informed O'Bara that all the financial records had been kept in a briefcase and the briefcase had been lost. O'Bara was concerned that the Association could reflect negatively on the Police Department.

**4.** In 1994, officers in the Police Department formed the Association. The stated purposes

of the Association were, among others, to "enhance the professional image of the Highland Village Police Department," "foster increased community support for the Highland Village Police Department from the citizens of Highland Village," "assist other charitable organizations," and "cooperate with all branches of out government at City, County, State and Federal level[s]." Every member of the Police Department, including the Police Chief, was automatically eligible for membership in the Association. In 1999, Myers was elected President of the Association. After his election, the Association became dormant. No monthly meetings were held even though the by-laws required them. After 1999, no elections were held. In 2000, the Association became inactive.

ing Hall. Myers then turned over the funds.[5]

Later, on November 21, 2001, Myers met with Hall at his home and informed him of the events regarding O'Bara and the Association funds. Myers further explained the details of the ethics investigation as related to him by O'Bara and his belief that O'Bara was being untruthful about his involvement in the Satriano transaction.

On November 23, 2001, Hall, while off-duty, posted the following message on a community web site entitled, **www.highlandvillage.com,** anonymously under the pseudonym "Deep Blue:" [6]

> Ethics violations within the police department are quickly being uncovered. Reports are that Chief O'Bara, a police officer, and the police auxiliary violated the City's Ethics Code. With the Chief's approval, a large sum of money was funneled through a police auxiliary fund to a police officer as a gift. This money gift was to help the officer with the purchase of a new home. Now the Chief is attempting to cover-up these violations by having the officer take out a loan to reimburse the original donor.

On November 27, 2001, O'Bara terminated Hall's employment with the City of Highland Village Police Department for posting the message on the web site. On November 28, 2001, Myers was interviewed by the department regarding his involvement in the Internet posting. Myers admitted to informing Hall of the details of his conversation with O'Bara regarding the Satriano transaction and also admitted to questioning fellow officers regarding the legality of O'Bara's order to turn over the Association's funds to the City. Myers also stated that he did not intend for Hall to disseminate this information to the public. On December 13, 2001, O'Bara demoted Myers to the rank of Police Officer, imposed a disciplinary suspension of three days without pay and placed Myers on a one-year probationary period for discussing the legality of the order with co-workers as well as discussing ethical violations with Hall.

On December 14, 2001, Myers timely appealed his demotion and suspension to the City Manager's office pursuant to City policy. On January 16, 2002, a disciplinary hearing was held. The City Manager designated the City's Finance Director to hear the appeal as the City Manager was unavailable. On January 29, 2002, the City's Finance Director upheld Myer's demotion, suspension, and probation.

On June 29, 2002, more than six months after his demotion, Myers and fellow patrol officer, Stephanie Olssen, responded to a domestic disturbance call. Myers was senior officer on duty for that call. According to the offense report filed by Myers in connection with the domestic disturbance call, the suspect of the domestic

**5.** There is a dispute as to whether O'Bara intended for the City to hold the funds temporarily or meant to donate the funds the Police Department's drug abuse awareness program. The City did eventually return the funds in January 2002.

**6.** Hall got his inspiration for the pseudonym "Deep Blue" from the Deep Blue Supercomputer. In 1997, IBM's Deep Blue Supercomputer played a match with chess world champion Gary Kasparov. In a finale that lasted barely more than an hour, Kasparov resigned 19 moves into Game 6, handing a historic victory to Deep Blue. The win gave the IBM supercomputer a 3.5–2.5 victory in the six-game match. It was the first time a current world champion has lost a match to a computer opponent under tournament conditions. *See* Rajiv Chandrasekaran, *For Chess World, A Deep Blue Sunday; Computer Crushes Kasparov in Final Game,* WASH POST, May 12, 1997, at A1. In 2003, in a rematch of "Man v. Machine" Kasparov and Deep Blue tied 3–3. *See* Lubomir Kavalek, *Chess,* WASH POST, Feb. 10, 2003, at C10.

abuse initially fled. Myers chased and drew his baton. The suspect stopped fleeing, calmed down, and returned to the house. The victim had visible injuries, but Myers did not make an arrest.[7] Instead, he issued a citation for a Class C misdemeanor.

On July 8, 2002, the victim of the domestic disturbance completed a Formal Complaint form at the Police Department. She stated that she wished that her father, who had abused her in the past, be sentenced to "rehab and AA meetings." Due to this citizen's complaint, the Police Department initiated an internal investigation. There is a dispute as to whether O'Bara was involved in this investigation. The investigation concluded that Myers had violated the General Orders of the Police Department as well as certain provisions of the Texas Penal Code and Texas Code of Criminal Procedure for failing to arrest the suspect at the scene and charge him with a Class A misdemeanor. Based on this incident, as well as Myers' overall disciplinary history, the City terminated Myers' employment on November 19, 2002 almost four months after the incident. Myers appealed this decision to the City Manager and on January 27, 2003, the City Manager upheld Myers' termination.

Myers claims that between the time he was demoted, suspended and placed on a one-year performance probation on December 13, 2001, and time he was terminated on November 19, 2002, he was assigned by his supervisors to act as the "Senior Officer on Duty" 45 different times.[8] Myers claims that he did not have sufficient evidence to arrest the suspect for a Class A misdemeanor.

As a result of these events, Myers filed a Second Amended Complaint against the City and O'Bara alleging that the City and O'Bara violated his free speech rights under the First and Fourteenth Amendments.[9] Myers alleges that his demotion and suspension were in retaliation for his exercising protected speech. Pending before the Court is the Defendant's Motions for Summary Judgment, which, for the foregoing reasons, the Court **DENIES**.

## SUMMARY JUDGMENT STANDARD

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998). An issue of material fact is genuine if the evidence could lead a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining

---

7. There is a dispute as to whether the injuries were caused during the domestic disturbance.

8. The "Senior Officer On Duty" is the longest tenured officer on the duty shift and is responsible for taking roll call at the beginning of the shift, issuing equipment to junior officers, and affixing his signature on the daily role "detail" sheets which are sued for attendance purposes.

9. In his First Amended Complaint, Myers alleged two counts. Count I was a claim brought under 42 U.S.C. § 1983 alleging that the City and O'Bara violated his free speech rights under the First and Fourteenth Amendments. Count II was a claim brought under 42 U.S.C. § 1983 alleging that the City of Highland, O'Bara, and Bahr violated his freedom of association rights under the First and Fourteenth Amendments. Pursuant to Federal Rule of Civil Procedure 15(a), Myers has dismissed Count II, his freedom of association claims against the City, O'Bara, and Bahr. Accordingly, the Court will only address Myer's free speech claim.

whether a genuine issue for trial exists, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must assert competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Mere conclusory allegations, unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir.1996); *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.1994). The party opposing summary judgment is required to identify evidence in the record and articulate the manner in which that evidence supports his claim. *Ragas,* 136 F.3d at 458. "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Summary judgment must be granted if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

## FIRST AMENDMENT CLAIM

██ The government is not permitted to compel persons to relinquish their First Amendment rights as a condition of public employment. *See Harris v. Victoria Independent Sch. Dist.,* 168 F.3d 216, 220 (5th Cir.1999). The Plaintiff must satisfy four elements to recover for a First Amendment retaliation claim: (1) Plaintiff must suffer an adverse employment decision; (2) Plaintiff's speech must involve a matter of public concern; (3) Plaintiff's interest in commenting on a matter of public concern must outweigh the Defendant's interest in promoting efficiency; and (4) the Plaintiff's speech must have motivated the Defendant's action. *Id.* (citing cases). The first two elements are legal in nature and are for the court to resolve. *Branton v. City of Dallas,* 272 F.3d 730, 739 (5th Cir.2001).

### (1) Did Myers suffer an adverse employment action?

Adverse employment actions include discharges, demotions, refusals to hire, refusals to promote, and reprimands. *See Benningfield v. City of Houston,* 157 F.3d 369, 377 (5th Cir.1998); *Harrington v. Harris,* 118 F.3d 359, 365 (5th Cir.1997); *Pierce v. Texas Dep't of Crim. Justice, Inst. Div.,* 37 F.3d 1146, 1149 (5th Cir.1994). Clearly Myers suffered an adverse employment action when he was demoted, suspended, placed on probation, and eventually terminated.

### (2) Was Myer's speech on a matter of public concern?

██ The Defendants make two arguments that Myers' speech was not a matter of public concern. First, the Defendants argue that Myers' discussion with Hall regarding the alleged misconduct was a conversation between two employees of the police department. Second, the Defendants contend that Myers never intended to publicize his discussion with Hall. "In order for speech by a public employee to enjoy constitutional protection from retaliation by a public employer, the speech must involve a matter of public concern." *Denton v. Morgan,* 136 F.3d 1038, 1042 (5th Cir.1998) (citing *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). "Matters of public concern are those which can 'be fairly con-

sidered as relating to any matter of political, social, or other concern to the community.'" *Branton v. City of Dallas,* 272 F.3d 730, 739 (5th Cir.2001) (quoting *Connick,* 461 U.S. at 146, 103 S.Ct. 1684). Speech "complain[ing] of misconduct within the police department ... [is] speech addressing a matter of public concern." *Thompson v. City of Starkville, Mississippi,* 901 F.2d 456, 463 (5th Cir.1990); *Wallace v. Texas Tech. Univ.,* 80 F.3d 1042, 1051 (5th Cir.1996). "Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials ... concerns matter public import." *Thompson,* 901 F.2d at 463 (quoting *Conaway v. Smith,* 853 F.2d 789, 796 (10th Cir.1988) (per curiam)). In making this determination, the court considers the "content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684. This involves a fact specific analysis. *See Thompson,* 901 F.2d at 461–62.

To rise to the level of public concern, Myers must have spoken in his role of citizen rather than as an employee addressing matters only of personal concern. *Connick,* 461 U.S. at 147, 103 S.Ct. 1684. "If releasing the speech to the public would inform the populace of more than the fact of an employee's employment grievance, the content of the speech may be public in nature." *Kennedy v. Tangipahoa Parish Library Bd. of Control,* 224 F.3d 359, 372 (5th Cir.2000) (citing *Thompson,* 901 F.2d at 463 n. 5). "The nature of their employment does not exclude the possibility that an issue of private concern to the employee may also be an issue of concern to the public." *Branton,* 272 F.3d at 740 (citing *Gonzalez v. Benavides,* 774 F.2d 1295, 1299 (5th Cir.1985)). "Neither the [First] Amendment itself nor our decisions indicate that ... freedom [of speech] is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." *Givhan v. Western Line Consolid. Sch. Dist.,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *see also Kennedy,* 224 F.3d at 374; *Thompson,* 901 F.2d at 467; *Benningfield v. City of Houston,* 157 F.3d 369, 373–74 (5th Cir.1998).

Myers claims retaliation for speech made on two occasions. First, Myers sought the advice of at least two co-workers whether the Chief's order to turn over the Association funds to the City was legal and attempted to find the phone number for a state labor organization for legal advice regarding the order. Second, Myers relayed his concerns to Hall that O'Bara was lying to cover-up his own misconduct in connection with the Satriano transaction.

The defendants rely primarily on *Terrell v. University of Texas System Police,* 792 F.2d 1360 (5th Cir.1986), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987), in arguing that Myers' speech was not of public concern. The *Terrell* court held that the speech at issue was not of public concern in part because the speech consisted exclusively of criticisms of the competence of the speaker's supervisor. *Id.* at 1362; *see also Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684 (employee intraoffice questionnaire was not speech of public concern inasmuch as questionnaire sought employee opinions on office's transfer policy). *Terrell* and *Connick* are thus distinguishable because the only reason that the public would be concerned about the speech there at issue was because it involved a public workplace. *See Terrell,* 792 F.2d at 1362 ("[A]lmost anything that occurs within a public agency could be of concern to the public...."). The Fifth Circuit has cited *Terrell* in identifying this critical distinction between speech concerning personnel policies and that con-

cerning public official misconduct, and designated the latter of "public concern." *Brawner v. City of Richardson, Tex.*, 855 F.2d 187, 191–92 & nn. 10–14 (5th Cir. 1988). Further, unlike *Terrell*, Myers' speech did not "involve a matter of purely intra-governmental concern." *Id.* Nor did Myers' speech constitute nothing more than complaints over internal police department affairs.

■ Unlike *Connick*, where "[the plaintiff's] questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo," 461 U.S. at 148, 103 S.Ct. 1684, Myers' conversation with Hall regarding the Satriano transaction, if revealed to the public, could expose potential wrongdoing. *Thompson*, 901 F.2d at 463. Similarly, Myers' conversation with co-employees questioning the legality of O'Bara's order to turn over the Association's funds, if revealed to the public, could expose potential wrongdoing. Thus, because Myers' speech concerned possible misconduct on the part of the Highland Village's Police Chief, the Court concludes that the content of Myers' speech was of a public nature.

Turning to the context and form of Myers' speech, Defendants argue that Myers' speech was private in nature and between employees of the Police Department. Defendants also argue that Myers speech was motivated by a private concern, namely, "to cover his own butt." Defendants contend that Myers informed Hall about the Satriano transaction because he was mad about having to turn over the Association funds. Further, Defendants contend that Myers was acting as an employee of the City disputing a personal grievance between himself and his employer and, thus, undeserving of any First Amendment protection. Also, De-

fendants argue that Myers spoke to these other employees while he was on duty.[10]

The private nature of Myers' speech is not dispositive: "This alone, however, does not necessitate a finding that his alleged speech was not connected to matter of public concern." *Id.* " 'The private nature of the statement does not . . . vitiate the status of the statement as addressing a matter of public concern.' " *Id.* at 467 (quoting *Rankin*, 483 U.S. at 386–87 n. 11, 107 S.Ct. 2891). "A holding to the contrary would mean that loyal employees seeking to rectify problems would lose constitutional protection for attempting to correct problems in house." *Id.* Myers' speech clearly went beyond his personal interest. The fact that Myers' speech involves an element of personal interest is not dispositive. *Dodds*, 933 F.2d at 273 (the existence of an element of personal interest on the part of an employee in the speech does not prevent finding that the speech as a whole raises issues of public concern); *see also Connick*, 461 U.S. at 149–50, 103 S.Ct. 1684. The Defendants' argument that the substance of Myers' speech concerns only a personal interest fails to address the totality of Myers' speech. Myers' speech is more akin to the remarks that the Fifth Circuit has found to address matters of public concern. *See, e.g., Branton*, 272 F.3d at 740; *Thompson*, 901 F.2d at 463; *Brawner*, 855 F.2d at 191–92. After examining Myers' speech in light of the above principles of law and drawing all reasonable inferences in favor of the non-movant, Myers, the Court finds that the content, form, and context of Myers' speech was on a matter of public concern.

### (3) Pickering Balancing Test

Because the Court holds that Myers' speech touches upon a matter of public

---

**10.** Myers spoke to Hall while he was off-duty.

concern, *Pickering* next requires that the court balance Myers' interest in making his statement against "the interest of the State, as an employer, in promoting the efficiency of public services it performs through its employees." *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731. The court should not consider the employee's statement in a vacuum. *Rankin,* 483 U.S. at 388, 107 S.Ct. 2891. "In performing the balancing, ... the manner, time, and place of the employee's expression are relevant as is the context in which the dispute arose." *Id.* (citing *Connick,* 461 U.S. at 152–53, 103 S.Ct. 1684; *Givhan,* 439 U.S. at 415 n. 4, 99 S.Ct. 693). The Supreme Court has recognized as relevant considerations "whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impeded the performance of a speaker's duties or interferes with the regular operation of the enterprise." *Pickering,* 391 U.S. at 570–73, 88 S.Ct. 1731.

■ "Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." *Rankin,* 483 U.S. at 388, 107 S.Ct. 2891. "[R]eal, not imagined, disruption is required, and the 'close working relationship' exception cannot serve as a pretext for stifling legitimate speech...." *Branton,* 272 F.3d at 741 (quoting *McKinley v. City of Eloy,* 705 F.2d 1110, 1115 (9th Cir.1983)). The balancing test is not all-or-nothing but rather a sliding scale under which "public concern" is weighed against disruption: "a stronger showing of disruption may be necessary if the employee's speech more substantially involves matters of public

concern." *Matherne v. Wilson,* 851 F.2d 752, 761 (5th Cir.1988) (quoting *Gonzalez v. Benavides,* 774 F.2d 1295, 1302 (5th Cir.1985)).

■ In this respect, Defendants fail to demonstrate, without dispute as to material facts, a state interest that outweighs Myers' First Amendment rights. Defendants argue that Myers could no longer be trusted but they fail to submit any summary judgment evidence to support this claim.[11] Whether Myers' speech caused or threatened to cause a disruption of the police department's efficient functions remains a question of fact. There are no doubt some instances in which the harm from the challenged speech is obvious. *See Connick,* 461 U.S. at 152, 103 S.Ct. 1684. The record before the Court does not fall within this category. There is contradictory evidence on the disruptive nature of Myers' speech. Viewed in the light most favorable to Myers, the evidence fails to show that Myers' statements caused anticipated delays, disruption, or interference with the functioning of the police department. Accordingly, the Court finds that there is a genuine issue of material fact as to whether Myers' speech interfered with the efficient functioning of the police department.

*(4) Whether Myers' speech was a substantial or motivating factor in the adverse employment decision?*

The Court must now decide whether Myers' speech was a substantial or motivating factor in the adverse employment decision. *Branton,* 272 F.3d at 739. Clearly, Myers' speech was a substantial or motivating factor in his demotion, suspension and one-year performance probation. However, whether Myers' speech

---

**11.** The City has attached an excerpt from Kevin Hall's deposition wherein he states that the only disruption was caused by the Chief of

Police "call[ing] officers off the street to find out who wrote the message."

was a substantial or motivating factor in his termination almost one year after his speech is a much closer question.

Defendants claim that the November 19, 2002 termination of Myers was not related to his exercise of free speech. Defendants claim that his prior disciplinary record and his mishandling of a June 29 domestic dispute were the reasons for Myers' termination. Myers, on the other hand, argues that his termination was continuing retaliation for the protected speech he made in November 2001.

Whether an employee's protected conduct was a substantial or motivating factor in an employer's decision to take action against the employee is a question of fact, ordinarily rendering summary disposition inappropriate. *Brawner v. City of Richardson, Tex.*, 855 F.2d 187, 193 (5th Cir. 1988) (summary judgment inappropriate because defendant's motive is a material issue of fact). The evidence that Myers presents to prove that his speech was a substantial motivating factor in his termination include: (1) after his demotion from Sergeant to police officer, Myers was scheduled to work as Senior Officer on Duty 45 times before his termination; (2) after the allegations regarding his failure to arrest on June 29 were sustained on August 8, 2002, Myers continued to work as a police officer for another three months; (3) on November 16, 2002, three days before his termination, Myers received "meet standards" performance evaluations for the months of July, August, September and October 2002 which were approved by O'Bara; (4) it was common practice in the police department during domestic disturbance calls to ask the victim if he/she suffered pain; (5) O'Bara never looked beyond Myers' original re-port although he stated that he typically looks at the totality of the circumstances in determining whether the officer should have made an arrest; and (6) another police officer was treated differently under similar circumstances; and (7) all of Myers' previous discipline, including his demotion, were considered when deciding whether to terminate his employment. Viewing this evidence in the light most favorable to Myers, the Court cannot say that a reasonable jury could not infer that Myers' speech was a substantial motivating factor in Defendants decision to terminate him.[12]

## MUNICIPAL LIABILITY

The City contends that it cannot be held liable under a theory of *respondeat superior* under § 1983 because (1) there is no unlawful conduct attributable to a policy maker and (2) "one-time" isolated acts cannot establish a governmental policy.

Title 42 U.S.C. § 1983 (1994) provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

In *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 689, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities and other local governmental bodies are "persons"

---

**12.** While Plaintiff "must ultimately prove that his speech was a motivating factor for his discharge, the determination of that issue turns on a genuine dispute of material fact, and is proper for trial, not for resolution by summary judgment." *Brawner*, 855 F.2d at 187, 194.

within the meaning of § 1983. The Supreme Court has also recognized that a municipality cannot be held liable under § 1983 solely because it employs a tortfeasor. *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 402, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Instead, in *Monell* and its progeny, the Supreme Court has required a plaintiff seeking to impose § 1983 liability on a municipality to identify a municipal "policy" that caused the plaintiff's injury. *See Monell,* 436 U.S. at 694, 98 S.Ct. 2018; *Brown,* 520 U.S. at 403, 117 S.Ct. 1382; *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *City of Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

■ A "policy" can stem from "a final decisionmaker's adoption of a course of action 'tailored to a particular situation and not intended to control decisions in later situations.'" *Brown,* 520 U.S. at 410, 117 S.Ct. 1382 (quoting *Pembaur,* 475 U.S. at 481, 106 S.Ct. 1292).[13] "[A] single decision by a policy maker may, under certain circumstances, constitute a policy for which the county may be liable." *Brown,* 219 F.3d at 462. Under this type of "policy," a municipality can be liable only if the decision to adopt that particular course of action is properly made by that government's authorized decisionmaker. *See id.* Such "authorized decisionmaker" is defined as an official " 'whose acts or edicts may fairly be said to represent official policy' " and whose decisions may therefore result in municipal liability under § 1983. *Id.* at 480 (quoting *Monell,* 436 U.S. at 694, 98 S.Ct. 2018). "[T]he determination of whether a municipal official wields final policymaking authority regarding a particular action constitutes a question of state law." *Brady v. Fort Bend County,* 145 F.3d 691, 698 (5th Cir.1998) (citing *McMillian v. Monroe County,* 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997)).

■ In order for a governmental entity to incur liability under § 1983 there must exist "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Piotrowski,* 237 F.3d at 580. "*Monell* describes the high threshold of proof by stating that the policy must be the 'moving force' behind the violation." *Piotrowski,* 237 F.3d at 580 (quoting *Monell,* 436 U.S. at 694, 98 S.Ct. 2018). Accordingly, "the plaintiff must initially allege that an official policy or custom 'was a cause in fact of the deprivation of rights inflicted.'" *Spiller v. City of Texas City,* 130 F.3d 162, 167 (5th Cir. 1997) (quoting *Leffall v. Dallas Indep. Sch. Dist.,* 28 F.3d 521, 525 (5th Cir.1994)). This connection must be more than a mere "but for" coupling between cause and effect. *City of Canton,* 489 U.S. at 386, 109 S.Ct. 1197.

Myers' disciplinary letter dated December 13, 2001, reveals that he was disciplined for violating city policies related to speech:

HVPD Code of Conduct—Chapter IV, "Professional Conduct and Personal Bearing" Section 4.7 subsections A & D

Section 4.7 provides in relevant part:

---

**13.** A formal policy is "[a] policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority." *Bennett v. City of Slidell,* 735 F.2d 861, 862 (5th Cir.1984) (en banc). An informal but still official policy is "[a] persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Id.*

Employees shall not publicly criticize or ridicule the department, its policies, or other employees by talking, writing or expressing in a manner which:

1. Is defamatory. . . .

D. Tends to impair the operation of the Department by interfering with its efficiency, by interfering with the ability of supervisors to maintain discipline, or by a reckless disregard for the truth.

■■■ Thus, the City has adopted a "policy" purporting to regulate the speech of its employees. Further, Plaintiff was charged with violating this policy. Even if the City had not acted pursuant to an "official policy" or "official custom," the evidence shows that the City Manager was the "final policy maker" in regard to discipline of city of employees and she ratified Myers' discipline. In *Neubauer v. City of McAllen, Tex.,* 766 F.2d 1567 (5th Cir. 1985), *overruled on other grounds by Walther v. Lone Star Gas Co.,* 952 F.2d 119, 126 (5th Cir.1992), the Fifth Circuit held that "the city manager ... was the only official who possessed policymaking power in termination proceedings sufficient to hold the City accountable under Section 1983. The [City's] Code designates the city manager as 'the administrative head of the municipal government,' and empowers the city manager to 'appoint or remove all subordinate employees.' The Code provides that the city manager must seek advice of the city commission before appointing or removing department heads, but does not limit his authority with regard to hiring or firing other subordinate employees." *Id.* at 1573–74. The same scenario exists here. The City Counsel has expressly delegated final policy making authority relating to discipline of city employees to the City Manager, who is appointed as the exclusive authority to implement city policy. Accordingly, the city manager's ratification of Myers' demo-

tion, suspension, and termination is imputable to the City.

## QUALIFIED IMMUNITY

■■■ O'Bara argues that he is entitled to the defense of qualified immunity. Qualified immunity is a defense for public officials if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Thompson v. Upshur County,* 245 F.3d 447, 456 (5th Cir.2001). "The bifurcated test for qualified immunity asks whether the plaintiff has alleged a violation of a clearly established right and, if so, whether the defendant['s] conduct was objectively unreasonable." *Palmer v. Johnson,* 193 F.3d 346, 351 (5th Cir.1999). Accordingly, when a defendant moves for summary judgment raising the defense of qualified immunity, the Court must first determined whether the facts, "[t]aken in the light most favorable to the party asserting the injury," establish that the defendant's conduct violated a clearly established right. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The Court has done so above.

■■■ If a § 1983 defendant pleads qualified immunity and shows that he is a governmental official whose position involves the exercise of discretion, the plaintiff bears the burden of rebutting this defense by establishing that the official's wrongful conduct violated a clearly established law. *Thompson,* 245 F.3d at 456–57, 460 (quoting *Pierce v. Smith,* 117 F.3d 866, 871(5th Cir.1997)). "Clearly established" means that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

The act in question "need not have been previously held unlawful; the unlawfulness of the official action must be apparent in light of pre-existing law." *Id.*

O'Bara claims that he did not know he was violating a known right by disciplining Myers. O'Bara argues that "the employment action taken against Myers was not objectively unreasonable, especially when considering the circumstances surrounding the conduct of Myers and the stated reasons for his discussions with his co-workers." At the time Myers was demoted and eventually terminated, the First Amendment right of an employee to speak out on a matter of public concern was clearly established. *See, e.g., Pickering,* 391 U.S. at 573–75, 88 S.Ct. 1731; *Thompson,* 901 F.2d at 463; *Brawner,* 855 F.2d at 191–92. After reviewing the cases, the Court concludes that at the time Myers' spoke out, it was clearly established under facts "not distinguishable in a fair way from the facts in the case at hand," that Myers' speech regarding police misconduct was protected. Consequently, a reasonable objective public official, identically situated as O'Bara, would have known that adverse employment action against an employee for his speech concerning police misconduct would violate a clearly established right. Accordingly, O'Bara is not entitled to summary judgment on his qualified immunity defense.

## CONCLUSION

For the reasons articulated above, the Court finds that Defendants' Motions for Summary Judgment should be **DENIED.**

**IT IS SO ORDERED.**